IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RECEIVED

2014 OCT 23 ⌐ 3: 00

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DIST. OF ALA

| | |
|---|---|
| BETTY WILSON,                              )<br>                                            )<br>        Plaintiff,                          )<br>                                            )<br>    v.                                      )<br>                                            )<br>LUTHER STRANGE, ALABAMA                     )<br>ATTORNEY GENERAL; MADISON                   )<br>COUNTY DISTRICT ATTORNEY'S                  )<br>OFFICE; ROBERT L. BROUSSARD,                )<br>DISTRICT ATTORNEY, MADISON                  )<br>COUNTY,                                     )<br>                                            )<br>        Defendants.                         ) | Civil Action No. 2.14-CV- 1106 -MHT-TFM |

## CIVIL COMPLAINT

NOW COMES Plaintiff, Betty Wilson ("Ms. Wilson"), by her counsel, and files this complaint, averring as follows:

### THE PARTIES

1.      PLAINTIFF, Ms. Wilson, is currently serving a life term of incarceration without the possibility of parole following her conviction for capital murder in the Circuit Court of Tuscaloosa County on March 3, 1993, and is in the custody of the Alabama Department of Corrections.

2.      DEFENDANT, Luther Strange ("Mr. Strange"), is the Attorney General for the State of Alabama. The Alabama Attorney General's Office is located at 501 Washington Avenue, Montgomery, Alabama 36104. As Attorney General, Mr. Strange is responsible for

formulating state policy for enforcing and defending the laws of Alabama, including the statute at issue in this case. Mr. Strange is sued in his official capacity.

3.     DEFENDANT, the Madison County District Attorney's Office, is located at 100 North Side Square, Huntsville, Alabama 35801. The Madison County District Attorney's Office has possession, control, and/or access to numerous items of physical evidence collected during the investigation of the crime of which Ms. Wilson was convicted which likely contain biological material suitable for DNA testing, but virtually none of which was ever DNA-tested due to the limited technology available at the time of Ms. Wilson's trial.

4.     DEFENDANT, Robert L. Broussard ("Mr. Broussard"), is the District Attorney for Madison County, Alabama. As the District Attorney, Mr. Broussard is responsible for criminal prosecutions in Madison County and for formulating policy regarding access to evidence in the possession and control of his office and of the law enforcement agencies with which Mr. Broussard works as prosecutor. Mr. Broussard is sued in his official capacity.

## JURISDICTION AND VENUE

5.     This court has jurisdiction pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1343 and 1331.

6.     Venue lies within the Middle District of Alabama under 28 U.S.C. §1391(b)(1) as Defendant Alabama Attorney General, Mr. Strange, resides within the Middle District and all other Defendants are residents of Alabama. Additionally, the state legislature responsible for promulgating the statute that Ms. Wilson challenges herein is located within the Middle District of Alabama and, consequently, a substantial part of the events giving rise to this claim took place in this District, permitting venue in this District pursuant to 28 U.S.C. § 1391(b)(2).

## BACKGROUND

### The Crime and Ms. Wilson's Conviction

7.     On May 22, 1992, Dr. Jack Wilson ("Dr. Wilson"), Ms. Wilson's husband, was found beaten and stabbed to death in his home in Huntsville, Alabama. A forensic pathologist from the Alabama Department of Forensic Sciences conducted an autopsy. The pathologist testified at trial that Dr. Wilson suffered numerous lacerations and severe blows to his head, neck, forearms, hands, and shoulder. Dr. Wilson also had two stab wounds, one through his liver and the other through his abdomen. The pathologist testified that the injuries to the forearms and hands, including the bruises and breaking of bones, were consistent with Dr. Wilson defending himself against his attacker, indicating that he had struggled with his assailant during a violent attack.

8.     After receiving an anonymous tip, police suspected James White ("Mr. White") of Dr. Wilson's murder. Police learned that Mr. White was an acquaintance of Peggy Lowe ("Ms. Lowe"), Ms. Wilson's sister, and learned of an alleged connection between Mr. White and Ms. Wilson. Mr. White was then arrested and charged with capital murder. The police also charged both Ms. Wilson and Ms. Lowe with capital murder.

9.     Ms. Wilson knew of Mr. White as her sister's handyman who assisted her sister (Ms. Lowe) on home improvement work. Ms. Wilson had very limited contact with Mr. White and had never met him in person.

10.    Mr. White initially denied any involvement in the murder, but changed his story multiple times. After the State threatened him with the death penalty, Mr. White entered into a plea bargain, admitting his guilt and securing a life sentence. As part of his plea bargain to avoid the death penalty, Mr. White agreed to testify that Ms. Wilson and Ms. Lowe hired him to murder Dr. Wilson.

3

11.     Ms. Wilson has always denied any involvement in the murder of her husband and

pleaded not guilty. The main issues at Ms. Wilson's trial were whether Mr. White murdered Dr.

Wilson and whether the sisters hired Mr. White to do so. Ms. Wilson was prosecuted solely on

the theory that she and her sister hired Mr. White to kill her husband, such that if Mr. White did

not commit the crime, Ms. Wilson (and Ms. Lowe) could not be guilty of hiring him to commit

the crime. Accordingly, the identity of the perpetrator was a key issue at Ms. Wilson's trial.

Apart from Mr. White's confession and testimony that Ms. Wilson hired him to commit the

murder, both of which were riddled with inconsistencies and were highly unreliable, there was

no evidence—no eyewitness and no physical evidence—connecting Ms. Wilson to the crime.

Nonetheless, on March 3, 1993, Ms. Wilson was convicted of capital murder and sentenced to

life in prison without possibility of parole.

12.     In a separate trial following Ms. Wilson's conviction, Ms. Wilson's sister, Ms.

Lowe, was acquitted of capital murder. The case against Ms. Lowe involved nearly identical

evidence as that introduced against Ms. Wilson.

13.     At Ms. Wilson's trial, there was a dearth of evidence corroborating Mr. White's

statements to police and trial testimony. In addition, as Judge Patterson highlighted in his dissent

to the Alabama Court of Criminal Appeals's denial of Ms. Wilson's appeal, Mr. White made

numerous—and significant—inconsistent statements about the crime. These multiple

inconsistencies, which call into question Mr. White's identity as the killer, include his pre-trial

statements to the police and his testimony at Ms. Wilson's and Ms. Lowe's trials. For example,

in a May 29, 1992 interview with police, Mr. White stated that he never stabbed Dr. Wilson, that

he had no weapons on him, and that he did not find a baseball bat at Dr. Wilson's home. This

interview is inconsistent with the crime scene and medical evidence presented at trial. Similarly,

4

in a June 5, 1992 interview with police, Mr. White confirmed these statements, but after persistent questioning about the baseball bat, ultimately changed his story and stated that his mind was "fuzzy" and that there was a chance he had picked up a baseball bat. Additionally, in several statements he made to the police, Mr. White stated that he could not recall what time the murder occurred because he suffered from blackouts, was intoxicated at the time, and was not wearing a watch.

14.     Mr. White also provided at least five different, conflicting accounts of the events subsequent to the murder. For example, on May 27, 1992, Mr. White told police that he had left the scene of the crime by running through the woods behind the Wilson home. However, in a subsequent interview on May 29, 1992, Mr. White stated that Ms. Wilson, who he claimed arrived back home unplanned and unannounced, drove him away from the scene after the crime.

15.     On June 1, 1994, one year after Ms. Wilson's conviction, Mr. White recanted his trial testimony in a sworn affidavit in which he insisted that he did not murder Dr. Wilson and that he was not part of any murder-for-hire scheme with Ms. Wilson and Ms. Lowe. Mr. White denied ever meeting with Ms. Wilson. His affidavit stated, "I was never propositioned by Mrs. Peggy Lowe to murder Dr. Jack Wilson. I made it all up in order to appease detectives, Mickey Brantley and Wayne Sharpe, so they would stop hounding me and threatening to send me to the electric chair." His affidavit further stated that he was "positive that [he] had nothing to do with [the murder of Dr. Wilson] and gave false testimony against Mrs. Betty Wilson and Mrs. Peggy Lowe."

16.     Ms. Wilson has consistently maintained her innocence of her husband's murder for more than twenty years. Her conviction was based solely on Mr. White's bargained-for testimony, which Mr. White has now recanted.

5

## Post-Conviction Proceedings

17.     In 1994, Ms. Wilson filed a state-court petition for post-conviction relief under

Alabama Rule of Criminal Procedure 32 ("Rule 32") on the basis of Mr. White's recantation, but

her petition was denied, as were her subsequent appeals of that denial.

18.     In his dissent from the Alabama Court of Criminal Appeals's denial of Ms.

Wilson's consolidated appeal of her conviction and the denial of her Rule 32 motion for post-

conviction relief, Judge Patterson stated that "the state fell short of producing evidence tending

to implicate Wilson with the crime" and that the following factors required the granting of

rehearing:

> The lack of corroboration of the testimony of the accomplice, James White; the
> subsequent acquittal of [Ms. Lowe], who allegedly acted as a go-between in
> arranging the killing; the recantation of the testimony of [Mr. White]; and the
> question whether the trial court and the majority of this court gave the proper
> weight to the recantation of White.

19.     Ms. Wilson appealed the Court of Criminal Appeals's denial and the Alabama

Supreme Court affirmed the decision below.  However, Justice Maddox, like Judge Patterson

before him, dissented from this affirmance, and stated that he would remand to the circuit court

on Ms. Wilson's claim that the State suppressed exculpatory evidence that would have cast

substantial doubt on the reliability of Mr. White's testimony.  Justice Maddox further observed

that the State admitted that it could not have secured Ms. Wilson's conviction without Mr.

White's testimony.

20.     Ms. Wilson later sought federal habeas corpus relief, but her petition was denied

by the Northern District of Alabama in 1998.  That denial was affirmed by the Eleventh Circuit

in 2000.

## DNA Evidence

21.     The police recovered numerous pieces of physical evidence from the crime scene, including (i) a baseball bat that police believed the perpetrator used to bludgeon Dr. Wilson, (ii) bloody fingernail clippings collected from the victim, (iii) a ski mask that police believed was worn by the perpetrator, (iv) hairs found inside the ski mask, (v) the victim's clothing, (vi) cigarette butts believed to have been left by the perpetrator, (vii) a bloodstained carpet sample found near the victim's body, and (viii) hairs recovered from the victim's right hand.

22.     Because DNA testing was in its infancy at the time of Ms. Wilson's trial in 1993, the DNA testing then available, DQ Alpha, a rudimentary form of testing, was only able to confirm that some of the blood on the bat was consistent with Dr. Wilson's blood type. No other DNA testing was performed.

### Ms. Wilson's Initial Attempt to Obtain Post-Conviction DNA Testing

23.     With the advent of more advanced forms of DNA testing, Ms. Wilson diligently continued to attempt to establish her innocence after her conviction. She sought DNA testing of the physical evidence recovered from the scene of Dr. Wilson's murder in order to show that Mr. White did not murder her husband—a showing that would entirely exonerate her of her husband's murder.

24.     In 2002, Ms. Wilson and the Madison County District Attorney filed a joint motion for DNA testing. Despite the District Attorney's joinder in the motion, the Attorney General intervened and argued that the circuit court lacked authority to grant the testing. The court dismissed the motion.

## Ms. Wilson's Attempt to Obtain DNA Testing Under Ala. Code § 15-18-200

25.     In 2009, the State of Alabama enacted Ala. Code § 15-18-200, providing inmates
convicted of a capital offense with the statutory right to seek post-conviction DNA testing of
biological evidence collected in connection with the investigation or prosecution of the crime of
which they were convicted where exculpatory results would establish their factual innocence.
Under the statute, if the petitioner meets the conditions, including by demonstrating that the
identity of the perpetrator was at issue at trial, the court "shall" order testing if there is a
reasonable possibility that, "*assuming exculpatory results*, [testing would] demonstrate the
[petitioner's] factual innocence." Ala. Code § 15-18-200(e)(3) (emphasis added).

26.     On July 30, 2010, Ms. Wilson timely moved for DNA testing pursuant to Ala.
Code § 15-18-200 in the Circuit Court of Madison County.  Ms. Wilson demonstrated that she
met all the requirements of § 15-18-200.

27.     In her motion, Ms. Wilson identified numerous items of physical evidence
secured in relation to the investigation and prosecution of the crime, explained in detail how each
item was suitable for DNA testing, and showed how testing could demonstrate her factual
innocence of her husband's murder.

28.     Each type of evidence that Ms. Wilson sought to test has been routinely tested in
current and decades-old cases, and has been key forensic evidence in solving crimes.  Ms.
Wilson demonstrated that today's advanced, highly sensitive DNA technology can identify a
victim's true perpetrator by the testing of trace amounts of blood, skin cells, hair, saliva, and/or
sweat from crime scene evidence.  Ms. Wilson discussed in detail the probative value of
fingernail clippings in homicide cases, especially in violent, close-range struggles, described how
advances in DNA testing have become sufficiently sensitive to detect profiles from saliva and

"wearer" DNA shed on masks worn by an individual, and demonstrated that DNA testing of skin cells left on objects gripped by an assailant can identify a victim's true perpetrator.

29.     In light of the evidence that Dr. Wilson struggled with his attacker, and the State's diligence in collecting and preserving evidence from the crime scene, Ms. Wilson identified at least two different ways that DNA testing could prove her factual innocence of the crime for which she was convicted.

30.     First, Ms. Wilson argued that if DNA test results revealed a "redundant," that is, the same, DNA profile on a combination of crime scene evidence items, the results would be compelling evidence that the source of the redundant profile was the assailant. She also demonstrated that the possibility of obtaining a redundant male DNA profile in this case is substantial because the police collected numerous items of evidence from the crime scene, including a ski mask believed to have been worn by the perpetrator, the baseball bat that police believed was used to bludgeon Dr. Wilson, and Dr. Wilson's bloody fingernail clippings. Additionally, defensive wounds on Dr. Wilson's hands and arms indicate that he had struggled with, and, consequently, may have scratched or dug his nails into the perpetrator while defending himself against the attack.

31.     Second, Ms. Wilson argued that she could establish her innocence through the frequently utilized practice of comparing a foreign DNA profile on crime scene evidence to the FBI's DNA offender database ("CODIS"), a national computerized state and federal registry which contains over ten million DNA profiles from convicted offenders, unsolved crimes and missing persons. This rapidly-expanding databank has enabled law enforcement agencies to enter DNA profiles to solve thousands of "cold cases," some decades old. Ms. Wilson demonstrated that a foreign DNA profile developed from just one item of evidence, such as the

ski mask, that is not consistent with Mr. White's DNA could be searched in CODIS and yield a "hit" to the real assailant. She noted that a CODIS hit could confirm her innocence *and* lead to the real assailant—who may still be at large, or, worse, continuing to commit crimes.

32.     Ms. Wilson further explained in her motion for post-conviction DNA testing, that in numerous DNA exoneration cases, the innocence of the wrongfully convicted person was established when DNA from the crime scene was matched to a known offender in the CODIS database. Likewise, redundant foreign DNA profiles have formed the basis of numerous post-conviction DNA exonerations. Because the State's theory at trial was that Mr. White alone murdered Dr. Wilson at the behest of Ms. Wilson and Ms. Lowe, a CODIS hit or a redundant profile that excludes Mr. White as the provider of that DNA would conclusively demonstrate that Mr. White was not the murderer which, consequently, would wholly exonerate her of having hired him to commit the murder.

33.     DNA testing has been instrumental in achieving hundreds of exonerations, many of which resulted from testing conducted decades after the evidence was collected. Advanced DNA technologies unavailable at the time of Ms. Wilson's trial, including Short Tandem Repeat ("STR") DNA testing, are capable of, and renowned for, yielding accurate and reliable DNA profiles from small amounts of evidence and degraded samples in decades-old cases. Ms. Wilson's motion for post-conviction DNA testing stated:

> [a]t the time of Petitioner's trial, DNA testing was in its infancy, and the sophisticated STR testing that has since revolutionized the criminal justice system was not yet available. The only testing done on the crime scene evidence was primitive in nature; while the results from that testing could not exclude White as the murderer, the results could not identify the murderer with any degree of certainty. By contrast, short tandem repeat (STR) testing that is now available could conclusively prove that White was not the person who killed Dr. Wilson . . . . Consequently, it would also establish Petitioner's innocence because no reasonable juror could possibly have convicted Petitioner of hiring White to kill Dr. Wilson if White himself was not Dr. Wilson's murderer.

34.     Ms. Wilson argued in her motion that the evidence presented against her at trial was circumstantial and highly unreliable and that, by contrast, as the Alabama Legislature recognized in enacting § 15-18-200, DNA technology is far more accurate and reliable in identifying a victim's true perpetrator, and would far outweigh Mr. White's now-recanted testimony.  Ms. Wilson also showed that courts have granted relief on the basis of actual innocence in cases where a co-defendant implicated a petitioner in a crime, pursuant to a plea agreement to avoid the death penalty, but DNA testing later excluded both.  Because her conviction was predicated solely on the theory that she and her sister hired Mr. White to murder Dr. Wilson, Ms. Wilson demonstrated that DNA test results that proved that Mr. White did not commit the crime would necessarily establish that she cannot be guilty of hiring Mr. White to commit the crime.  Therefore, DNA testing can conclusively demonstrate that Ms. Wilson has spent over two decades in prison as an innocent woman.

35.     On August 19, 2011, one year after Ms. Wilson filed her motion for post-conviction DNA testing in the Circuit Court of Madison County, the circuit court, without holding oral argument or conducting an evidentiary hearing, denied her motion in a cursory order, listing the following three grounds for denial without any written analysis or elaboration:  (1) "the results of the forensic DNA testing, on its face, would not demonstrate the petitioner's factual innocence of the offense convicted.  Even if other DNA specimens are present on the evidence . . . this would not, on its face, exonerate James White or Petitioner of the murder of Dr. Jack Wilson"; (2) "Petitioner has failed to demonstrate to this Court that the evidence would yield accurate and reliable results if it is now subjected to DNA testing . . . . Petitioner's statements that such evidence contains or is very likely to contain biological materials suitable for DNA testing is not sufficient proof that any such biological material would provide

appropriate specimens suitable for DNA testing eighteen years after the murder"; and (3) "there is no reasonable possibility that the testing will produce exculpatory evidence that would exonerate the applicant of the offense for which the applicant was convicted." *See* Order attached hereto at Exhibit A.

36.    On September 19, 2011, Ms. Wilson moved for reconsideration, arguing that the order did not explain why the court determined that DNA testing could not exonerate her. Ms. Wilson argued in her motion for reconsideration that the court's conclusion that there is "no reasonable possibility that testing will produce exculpatory evidence . . ." was cursory and devoid of any explanation. Such a ruling also presupposes a non-exculpatory outcome of the testing, and thereby arbitrarily and unconstitutionally deprives an inmate in Ms. Wilson's position of a realistic opportunity to exercise the right ostensibly created by the Alabama post-conviction DNA statute, rendering it illusory. It effectively nullifies the principle underlying Ala. Code § 15-18-200, that reliable scientific evidence can establish innocence.

37.    Ms. Wilson's motion for reconsideration emphasized that modern DNA technology can identify the real perpetrator of this crime and that, when considering a motion for post-conviction DNA testing under § 15-18-200, courts are *required to assume* that the results of DNA testing will be exculpatory. Ms. Wilson argued that exculpatory results from testing the physical evidence that was collected from the scene of the crime could both exclude Mr. White, whom the State argued was the sole assailant, and identify the real perpetrator of the crime and that such a result would necessarily exonerate her of hiring Mr. White to commit the murder. Ms. Wilson underscored that her conviction was predicated entirely on the theory that she and her sister (who was acquitted) hired Mr. White to murder her husband and that no reasonable juror

12

could find her guilty of hiring Mr. White to commit the murder if Mr. White himself was not the assailant.

38.     As for the circuit court's unexplained conclusion that Ms. Wilson failed to offer "sufficient proof" that the evidence would provide "appropriate specimens" for DNA testing, Ms. Wilson explained that the items she sought to test are, by definition, biological material on which DNA testing can be performed and that the DNA testing she requested has routinely provided critical evidence to solve decades-old cases. She further argued that she could not provide additional "proof"—which only a DNA laboratory can provide after examining the evidence—without access to the evidence. To construe Alabama's DNA statute otherwise renders the statute Kafkaesque.

39.     On October 2, 2011, in a one-sentence order, the circuit court denied Ms. Wilson's motion for reconsideration without explanation. *See* Order attached hereto at Exhibit B.

40.     On September 28, 2011, Ms. Wilson appealed to the Alabama Court of Criminal Appeals. On October 5, 2011, the Court of Criminal Appeals ordered her to show cause as to why her appeal should not be dismissed as an appeal from a non-appealable order. Ms. Wilson submitted a timely response that articulated the necessity of appellate review to address the multiple constitutional infirmities in the circuit court's order. The following day, on October 26, 2011, the Court of Criminal Appeals dismissed her appeal on the basis that the circuit court's order was non-appealable. *See* Order attached hereto at Exhibit C.

41.     On November 9, 2011, Ms. Wilson filed an application for rehearing in the Court of Criminal Appeals. Five months later, on April 13, 2012, the Court of Criminal Appeals dismissed Ms. Wilson's application based on a case it decided *three weeks earlier* which held that a writ of mandamus is the only appropriate vehicle to seek redress of a circuit court's denial

13

of a motion for post-conviction DNA testing. No Alabama state court had explicitly established mandamus as the proper—and only—avenue for seeking review of a ruling on a motion for post-conviction DNA testing until well after the circuit court had denied Ms. Wilson's request for DNA testing. *See* Order attached hereto at Exhibit D.

42.     On May 2, 2012, Ms. Wilson filed a petition for a writ of mandamus in the Alabama Court of Criminal Appeals. On September 6, 2012, the Court of Criminal Appeals dismissed the petition on "jurisdictional grounds." The Court of Criminal Appeals concluded that even if mandamus were granted, the circuit court lacked jurisdiction to modify its denial of Ms. Wilson's motion for DNA testing because more than thirty days had passed since the ruling was entered and the Alabama Court of Criminal Appeals "lost all possibility of acquiring appellate jurisdiction to remand the case for the judgment to be vacated." *See* Order attached hereto at Exhibit E.

43.     Ms. Wilson then filed a petition for a writ of mandamus in the Supreme Court of Alabama, explaining in detail why the writ should issue in her case. That petition was denied without explanation on October 23, 2012, in a cursory one-sentence order. Ms. Wilson has no further recourse in the Alabama State courts. *See* Order attached hereto at Exhibit F. As of October 23, 2012, she has exhausted her remedies in state court, rendering authoritative the circuit court's August 19, 2011 construction of Ala. Code §15-18-200, which, as thus construed, is arbitrary and unconstitutional.

## COUNT I:  VIOLATION OF PROCEDURAL DUE PROCESS

44.     Ms. Wilson incorporates by reference paragraphs 1 through 43 of this Complaint as set forth fully herein.

45.     The State of Alabama provides a post-conviction process for prisoners to obtain DNA testing to demonstrate their innocence in acknowledgment of the unique potential of DNA evidence to exonerate the wrongfully convicted.

46.     Ms. Wilson has fully availed herself of the judicial mechanisms available to her to seek access to the physical evidence in Defendants' possession or control for post-conviction DNA testing to prove her innocence of the brutal murder of her husband.

47.     Yet, Ms. Wilson was denied access to the physical evidence collected in connection to the investigation and prosecution of the crime for which she was convicted because Alabama's procedures for post-conviction access to DNA testing, as authoritatively construed by the Alabama courts, are fundamentally inadequate to ensure meaningful access to its post-conviction process.

48.     Alabama courts have authoritatively construed Ala. Code § 15-18-200 such that it fails to satisfy the requirements of procedural due process.  As authoritatively construed, this statute, while ostensibly creating a liberty interest by affording capital inmates the opportunity for exoneration through DNA testing, erects arbitrary barriers that frustrate the very right that the statute purports to create.

49.     First, the Alabama courts have authoritatively construed the statute to foreclose DNA testing if a court simply announces, without providing any reasoning or explanation, that the DNA testing will not exonerate the inmate even though the statute requires the court to "assum[e] exculpatory results" in making that determination.  The Alabama courts' authoritative construction of the statute permits the courts to presume a negative outcome which defeats the very purpose of the statute of affording inmates access to the unique value provided by DNA testing.  Where, for example, an individual's guilt is established through the word of an

15

unreliable, incentivized witness who later recants his testimony, and where access to DNA testing could establish that someone else committed the crime, to construe the statute as permitting a court arbitrarily to presuppose a non-exculpatory outcome, without reasoned explanation or justification, is a denial of due process.

50.    Second, Ala. Code § 15-18-200 has been authoritatively construed to deny inmates access to physical evidence for DNA testing unless they first come forward with "sufficient proof" that the biological material sought to be tested "would provide appropriate specimens suitable for DNA testing." This construction does not merely require the inmate to provide a prima facie statement that the evidence sought to be tested likely contains biological material and is suitable for DNA testing, which is capable of testing small amounts of evidence in decades-old cases, but rather arbitrarily requires the inmate to set forth additional affirmative "proof" that the biological material would be an "appropriate specimen" for DNA testing decades after the evidence was collected. The evidence in this case, as in most criminal cases, has been in the complete and continuous custody and control of the State. Ms. Wilson cannot provide this "proof" without access to the evidence. By authoritatively construing Alabama's DNA testing statute as imposing a requirement on an inmate to satisfy a higher level standard of "proof" that the evidence sought to be tested is an "appropriate specimen" for testing (proof that only a qualified DNA lab could provide), Alabama courts require the inmate to examine the evidence while denying her access to the same evidence. This imposes an impossible burden that, as a practical matter, places the inmate in a Catch-22.

51.    Accordingly, on its face, Ala. Code §15-18-200, as authoritatively construed by Alabama courts, deprives prisoners of their procedural due process and liberty interests in violation of the Due Process Clause of the Fourteenth Amendment of the United States

Constitution and offends fundamental principles of justice, and also, as applied specifically to Ms. Wilson, deprives her of her due process rights.

## COUNT II: DENIAL OF DUE PROCESS ON APPELLATE REVIEW

52.     Ms. Wilson incorporates by reference paragraphs 1 through 43 of this Complaint as set forth fully herein.

53.     The Alabama state courts have held that there is an avenue for review of a circuit court's decision denying a motion for post-conviction DNA testing.  However, when Ms. Wilson attempted to seek that review, the state courts told her that such review is unavailable.

54.     The Alabama courts have thus created a conundrum, frustrating any meaningful opportunity to seek post-conviction DNA testing pursuant to Ala. Code § 15-18-200 and offending fundamental notions of due process.  Accordingly, Alabama's procedures for post-conviction access to DNA testing, as authoritatively construed by Alabama courts, are fundamentally inadequate to ensure meaningful access to its post-conviction process.

55.     Ms. Wilson's case illustrates this complete denial of due process.  The Alabama Court of Criminal Appeals inexplicably waited until Ms. Wilson filed an application for rehearing to announce that mandamus was the only avenue for review and relief.  The Court of Criminal Appeals further frustrated any opportunity for meaningful review by holding that it lost all possibility of acquiring appellate jurisdiction to remand the case for the judgment to be vacated, because the *circuit court* lost jurisdiction to modify its denial of Ms. Wilson's motion for DNA testing once thirty days had elapsed therefrom. These arbitrary actions of the state appellate system violated due process on their own and compounded the prior due process violations in the circuit court's construction of Ala. Code § 15-18-200.

## COUNT III:  DENIAL OF RIGHT TO MEANINGFUL ACCESS TO COURTS

56.     Ms. Wilson incorporates by reference paragraphs 1 through 43 of this Complaint as set forth fully herein.

57.     Ms. Wilson has consistently maintained that she is innocent of this crime.   She has alleged that DNA testing can conclusively demonstrate that the individual she was convicted of hiring to kill her husband did not commit the offense, thus proving that she did not hire him to commit the offense.

58.     Alabama has provided a post-conviction process for inmates to seek access to the physical evidence collected in their case for DNA testing to demonstrate their innocence through the enactment of Ala. Code § 15-18-200.

59.     Ms. Wilson would have the opportunity to raise a viable post-conviction claim if she could access the physical evidence in Defendants' possession or control.  Ms. Wilson could raise a post-conviction claim pursuant to Alabama Rule of Criminal Procedure 32 to seek a new trial if the results of the testing are exculpatory.

60.     Ala. Code §15-18-200, as authoritatively construed by Alabama courts, imposes insurmountable barriers to accessing this evidence and, therefore, arbitrarily and unconstitutionally deprives Ms. Wilson of meaningful access to the Rule 32 post-conviction procedures provided by Alabama law to establish that she is actually innocent of the crime for which she is incarcerated, in violation of the Petition Clause of the First Amendment to the United States Constitution and the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution.

## COUNT IV: DENIAL OF OPPORTUNITY TO PROVE ACTUAL INNOCENCE

61.     Ms. Wilson incorporates by reference paragraphs 1 through 43 of this Complaint as set forth fully herein.

62.     By refusing to release the physical evidence for DNA analysis, and thereby preventing Ms. Wilson from gaining access to evidence which could exonerate her, Defendants have denied Ms. Wilson the opportunity to make a conclusive showing that she is actually innocent of the crime for which she is currently incarcerated, in violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

63.     The State will suffer no prejudice by allowing Ms. Wilson to access the evidence for purposes of DNA testing. The testing Ms. Wilson seeks may be conducted at a fully-accredited DNA laboratory with the expenses to be paid by her counsel at the Innocence Project, in which case it would proceed at no cost to the State. DNA testing is also in the State's interest. Testing can both determine whether an innocent woman is in prison and identify the real murderer, who may still be at large.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Betty Wilson requests a judgment:

      A.  Ordering Defendants to take all steps reasonably necessary to ensure that the physical evidence collected in connection to the investigation or prosecution of the crime for which Plaintiff was convicted, including all of the evidence referenced in this complaint, is preserved.

      B.  Ordering Defendants to cooperate with Plaintiff in selecting a mutually-agreeable, fully-accredited private DNA laboratory to test the evidence at the expense of the Innocence Project, or, in the alternative, ordering that the evidence be tested at a specific laboratory chosen by this Court.

      C.  Ordering Defendants to release the physical evidence collected in connection to the investigation or prosecution of the crime for which Plaintiff was convicted for DNA testing to the laboratory chosen by the parties or this Court, including, but not limited to:

- the baseball bat;

- the victim's bloodstained fingernail clippings;

- the ski mask;

- the hairs found inside the ski mask;

- the victim's bloody clothing;

- the cigarette butts found at the scene;

- the bloodstained carpet sample found near the victim's body; and

- the hairs collected from the victim's right hand;

D. Ordering reasonable attorneys' fees and costs.

E. Ordering such other and further relief as the Court deems just and proper.

Dated: October 23, 2014

Respectfully submitted,

*Counsel for Plaintiff*

Wesley C. Redmond
ASB-3666-D30W
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
Wells Fargo Tower
420 North 20th Street, Suite 1400
Birmingham, Alabama 35203
Tel.: (205) 328-0480
Facsimile: (205) 322-8007
E-mail: wredmond@bakerdonelson.com

Peter D. Isakoff
(Admission *pro hac vice* pending)
WEIL, GOTSHAL & MANGES LLP
1300 Eye Street, NW, Suite 900
Washington, DC 20005
Tel.: (202) 682-7000
Facsimile: (202) 857-0940
E-mail: peter.isakoff@weil.com

Seema Saifee, *Staff Attorney*
(Admission *pro hac vice* to be filed)
INNOCENCE PROJECT
40 Worth Street, Suite 701
New York, NY 10013
Tel.: (212) 364-5982
Fax: (212) 364-5341
E-mail: ssaifee@innocenceproject.org

## CERTIFICATE OF SERVICE

I certify that on this 23rd day of October, 2014, I manually filed the foregoing with the

Clerk of the Court and effected service on the following through certified U.S. Mail, first class

postage prepaid via the Clerk of the Court:

Luther Strange
Alabama Attorney General
Office of the Attorney General
501 Washington Ave.
Montgomery, AL 36104
Telephone: (334) 242-7300

Robert L. Broussard
District Attorney of Madison County
Office of the Madison County District Attorney
100 North Side Square
Huntsville, Alabama 35801
Telephone: (256) 532-3460

Office of the Madison County District Attorney
100 North Side Square
Huntsville, Alabama 35801
Telephone: (256) 532-3460

*Counsel for Plaintiff*

Wesley C. Redmond
ASB-3666-D30W
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
Wells Fargo Tower
420 North 20th Street, Suite 1400
Birmingham, Alabama  35203
Telephone: (205) 328-0480
Facsimile: (205) 322-8007
E-mail: wredmond@bakerdonelson.com