# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

BETTY WILSON,

                  Plaintiff,

      v.

STEVEN T. MARSHALL, Alabama
Attorney General, *et al.*,

                  Defendants.

Civil Action No. 2:14-cv-01106-RAH-KFP

## PLAINTIFF'S OBJECTIONS TO MAGISTRATE'S REPORT AND RECOMMENDATION

## I.     Introduction

Plaintiff Betty Wilson has spent 28 years, over half of her adult life, serving a life sentence on her conviction for the murder of her husband, Dr. Jack Wilson.  The State's theory was that Ms. Wilson and her sister hired James White to kill her husband.  White testified at Ms. Wilson's trial that Ms. Wilson's sister hired him to commit this murder.  He testified pursuant to a plea deal that kept him from receiving the death penalty in his own case.  He maintained that testimony only until Ms. White's trial was over: one year later, he totally recanted his story and averred not only that his testimony about being hired by Ms. Wilson's sister was false, but also that he had no involvement whatsoever in Dr. Wilson's death.  Even absent his recantation, White's testimony was contradicted by other evidence in the case.  His ultimate recantation only emphasizes that Ms. Wilson's conviction was based entirely on a shaky and self-interested account of the crime, and that there are many reasons to doubt that White's testimony is true.  Once White's account falls apart, there is every reason to believe that Ms. Wilson is innocent.

Ms. Wilson has raised the many reasons to discount White's now-recanted trial testimony, but none of the evidence and arguments about Mr. White are as probative as forensic DNA testing would be in answering the question of who actually killed Dr. Wilson.  Whoever killed Dr. Wilson left their DNA at the scene and on the implements used to kill him.  Dr. Wilson was beaten and stabbed to death

in what the scene suggested was a close-range struggle where he unsuccessfully fought for his life.  Police collected a bloody baseball bat found by Dr. Wilson's body, hairs found in Dr. Wilson's hand, a ski mask police believed to be worn by the perpetrator that contained hairs, and bloody fingernail clippings from Dr. Wilson. An expert has averred, and the State's laboratory expert agrees, that advancements in DNA technology would allow a forensic DNA testing laboratory to identify a unique DNA profile from this evidence, compare this profile to Mr. White and, if excluded, submit this profile to the state and local CODIS databases to identify this perpetrator.  If this crime were committed today and not back in 1992, this is one of the first things law enforcement would do to try to solve this case.

Ms. Wilson's innocence is not, strictly speaking, the issue before this Court. The question before this Court is whether the process Alabama has provided people in Ms. Wilson's position to try to obtain DNA testing is sufficient to preserve those litigants' rights to due process under *Dist. Atty's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52 (2009).  Ms. Wilson unsuccessfully sought post-conviction DNA testing in state court.  She failed because the Alabama DNA testing statutory framework is fundamentally unfair.  First, Ala. Code § 15-18-200(f)(2), as written and as authoritatively construed, guarantees courts a "way out" to deny DNA testing and to reject the *prima facie* evidence of exculpatory results put forward by potentially innocent prisoners, including those who can demonstrate by a reasonable

3

probability that exculpatory DNA results would have led to a different outcome at trial, and imposes a higher burden on the defendant just to obtain a DNA test than Ala. R. Crim. P. 32, on its face and as construed, requires to vacate her conviction based on favorable results from that test. Second, Ala. Code § 15-18-200(c)(1) states that before testing can be ordered, the court must find that the evidence sought to be tested will produce accurate and reliable results, a finding that imposes an impossible burden on the applicant and requires the court to speculate as to whether sufficient and viable DNA is located on the evidence. (*See* Doc. 1, Compl. ¶¶ 47-51; Doc. 40, Pl.'s Br. in Supp. of Mot. for Summ. J. at 2-3, 27-29, 36, 40, 44-62; Doc. 50, Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. at 6-14; *see also* Doc. 27, Order and Recommendation (9/14/18) at 29-30.) These provisions violate recognized principles of fundamental fairness and violate litigants' rights to due process.

After Ms. Wilson filed the present action pursuant to 42 U.S.C. § 1983, and following motion to dismiss briefing, both sides filed Rule 56 cross-motions for summary judgment. Following extensive summary judgment briefing (Docs 38, 39, 40, 50, 52, & 56), the magistrate judge issued a Report and Recommendation that ignored or misconstrued Plaintiff's arguments, and that made several key factual errors in granting partial summary judgment to Defendants (Doc. 65, "Recommendation"). The Recommendation mistakenly concludes that Alabama's DNA testing framework is in keeping with the national landscape of DNA statutes

(while simultaneously rejecting this comparison as an appropriate method for assessing the Alabama statute), when in actuality it is an outlier. *See* Doc. 65 at 20-29. The Recommendation also misapplies prior Eleventh Circuit precedent as blessing the Alabama statute when all available precedent directs this Court to find that this statutory framework violates due process. *See* Doc. 65 at 17-20. Moreover, the Recommendation misapprehends the nature of the testing Ms. Wilson seeks, and incorrectly summarizes the factual background of Ms. Wilson's case and the merits of her testing request. *See* Doc. 65 at 22-24, 34-35 at fn. 16-17. Viewing the evidence in the light most favorable to Ms. Wilson, there are several genuine issues of law for trial and a jury could reasonably find for Ms. Wilson. *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003); *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). The magistrate judge thus erred in recommending Defendants' motion for summary judgment be granted.

Ms. Wilson globally objects to all legal and factual conclusions reached in the Recommendation.[1] In the below Objections, she identifies numerous specific factual and legal errors the Court made in granting in part Defendant's motion for summary judgment.

---

[1] The Recommendation noted that the Court already adopted the magistrate judge's Report and Recommendation dismissing Plaintiff's as-applied challenge and other aspects of Plaintiff's claims. (Doc. 65 at 2 (citing Doc. 29 at 3).) Plaintiff maintains her legal opposition to that ruling, but recognizes that determination is not at issue in this current Recommendation.

A district court reviewing a magistrate judge's report and recommendation "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). The Court should review *de novo* all legal conclusions made by the magistrate judge regardless of Plaintiff's objections. *United States v. Keel*, 164 F. App'x 958, 961 (11th Cir. 2006) (*citing United States v. Warren*, 687 F.2d 347, 348 (11th Cir. 1982)). As to factual issues, where a party makes a specific objection to a magistrate judge's report, the district court "must conduct a *de novo* review of that issue." *Macort v. Prem, Inc.*, 208 F. App'x 781, 784 (11th Cir. 2006) (citing *Stokes v. Singletary*, 952 F.2d 1567, 1576 (11th Cir. 1992); *LoConte v. Dugger*, 847 F.2d 745, 750 (11th Cir. 1988)). This Court has the "duty to conduct a careful and complete review" when reviewing the magistrate judge's report and recommendations. *Williams v. Wainright*, 681 F.2d 732, 732 (11th Cir. 1982) (quoting *Nettles v. Wainwright*, 677 F.2d 404, 408 (4th Cir. 1982)).

Applying this standard, and for all the reasons set forth in Plaintiff's prior summary judgment pleadings and in this Objection, Plaintiff respectfully requests that this Court reject the Recommendation and instead grant Plaintiff's motion for summary judgment and deny Defendants' motion for summary judgment.

## II.     Objections

### A.     The Recommendation Erred In Finding that Ala. Code § 15-18-200 As Authoritatively Construed Does Not Violate Due Process

The Recommendation rejected Plaintiff's arguments and precedent supporting a conclusion that Ala. Code § 15-18-200, as authoritatively construed, violates due process. *See* Doc. 65 at 8-11; 33-36. It rejected Plaintiff's reliance on the framework the Supreme Court identified in *Cooper v. Oklahoma*, 517 U.S. 348, 362 (1996), that assessed due process considerations with a statute by examining how other state statutory frameworks looked at the same issue, using those frameworks as a lens for assessing traditional and contemporary practices. *See* Doc. 65 at 12, fn. 2. The Recommendation rejected *Cooper*, then ignored the objective evidence about the ways other state statutes have been authoritatively construed to contend both that the Eleventh Circuit had blessed a similar statute, and that Pennsylvania's similar requirements had been affirmed by federal courts there. It also erred in claiming that Plaintiff had not demonstrated how Alabama courts had addressed other DNA testing motions filed under §15-18-200 – in fact, Plaintiff's pleadings attached and analyzed the scope of authority on this issue. *See* Doc. 65 at 24-29. Finally, it improperly rejected Plaintiff's *in pari materia* arguments. *See* Doc. 65 at 29-31. These errors, both legal and factual, led to the Recommendation's erroneous conclusion that Defendants were entitled to summary judgment on the constitutionality of § 15-18-200.

**1.    Alabama's Heightened Standard is Out of Step with the Vast Majority of States in this Nation.  *Cooper* is Instructive and the Recommendation Erred in Finding to the Contrary.**

In *Cooper*, 517 U.S. at 362, the U.S. Supreme Court outlined the framework by which to analyze whether a state's procedural burden comports with the requirements of due process.  There, the Court examined whether Oklahoma's statutory requirement that a criminal defendant, who is presumed competent, establish incompetence by clear and convincing evidence placed such a stringent burden of proof on the defendant so as to violate his right to due process of law under the Fourteenth Amendment.  *Id*. at 350, 353.  In conducting that analysis, the Court first examined traditional and contemporary practices and then considered whether Oklahoma's rule exhibited fundamental fairness in operation.  *Id*. at 356-67.  Vital to the Court's analysis was whether other states had a burden of proof similar to Oklahoma's.  *Id*. at 360.  Surveying jurisdictions outside Oklahoma, the Court found that forty-six states and the federal courts used a lower standard, preponderance of the evidence, to prove incompetence.  *Id.* at 360-62.  Only four states required the defendant to prove his incompetence by clear and convincing evidence.  *Id*. at 360.  The Court concluded that

> [t]he near-uniform application of a standard that is more protective of the defendant's rights than Oklahoma's clear and convincing evidence rule supports our conclusion that the heightened standard offends a principle of justice that is deeply "rooted in the traditions and conscience of our

people." *Medina v. California*, 505 U.S., at 445, 112 S.Ct.,
at 2577 (internal quotation marks omitted).

*Id*. at 362.[2]

In the second prong of its due process analysis, the Court evaluated the significant risks in Oklahoma's practice of requiring criminal defendants to meet a heightened burden to prove incompetence. *Id*. at 362. Noting that Oklahoma's clear and convincing standard affected a class of cases in which the defendant had already shown that he was more likely than not incompetent, the Court held that the consequences to the defendant of an erroneous determination of competence are "dire," in comparison with the relatively "modest" cost to the State. *Id*. at 364-65. The Court concluded that for a defendant who is unable to assist in his own defense, an erroneous finding of competence would deny him a fair trial. *Id.* at 364. The Court could "perceive no sound basis for allocating to the criminal defendant the large share of the risk which accompanies a clear and convincing evidence standard," and concluded that Oklahoma's rule was incompatible with due process requirements. *Id*. at 366, 369.

---

[2] "Historical practice is probative of whether a procedural rule can be characterized as fundamental." *Id*. at 356 (quoting *Medina*, 505 U.S. at 446). Here, as in *Cooper*, there is no suggestion that the procedural rule that Alabama seeks to defend has any roots in historical practice. *See id.* at 356.

The Recommendation disregarded *Cooper* as irrelevant because it "involved mental incompetence before trial, when, as recognized in *Osborne*, defendants are afforded more constitutional protections and states are afforded less flexibility." Doc. 65 at 12, fn. 1.  This attempt to distinguish *Cooper* ignores the reasoning of *Cooper* itself.  Examining U.S. Supreme Court precedent to inform constitutional interpretation does not amount to equating rights.  Under *Osborne,* the analysis comes down to fundamental fairness, and concerns with fundamental fairness are undoubtedly present when convicted persons seek access to potentially dispositive DNA evidence.  *Osborne*, 557 U.S. at 95 (Stevens, J., joined by Ginsburg and Breyer, JJ., dissenting) ("Insofar as it is process Osborne seeks, he is surely entitled to less than 'the full panoply of rights,' that would be due a criminal defendant prior to conviction, [but] [t]hat does not mean, however, that our pretrial due process cases have no relevance in the postconviction context.") (internal citation omitted).

The Recommendation's disregard of *Cooper* creates a distinction the Supreme Court itself did not make in *Cooper* when it conducted a comparative analysis of Oklahoma's statute to see whether Oklahoma's approach was unnecessarily stringent compared to other states.  The Court's analysis had nothing to do with the posture of the case, and the Recommendation cites no authority that would meaningfully distinguish *Cooper* from this case.  Indeed, *Cooper's* due process analysis is instructive here: the fact that the standards contained within Alabama's

DNA statute are out-of-step with most other statutes around the country parallels the U.S. Supreme Court's constitutional concern in that case. Indeed, in denying Defendants' motion to dismiss Ms. Wilson's facial constitutionality claim, this Court ruled that

> for purposes of assessing Wilson's facial procedural due process claim with respect to Alabama's DNA law, "the question is whether consideration of [Wilson's] claim within the framework of the State's procedures for postconviction relief 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,' or 'transgresses any recognized principle of fundamental fairness in operation.' *Medina v. California*, 505 U.S. 437, 446, 448, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992) (internal quotation marks omitted); *see Herrera*, *supra*, at 407-408, 113 S.Ct. 853 (applying *Medina* to postconviction relief for actual innocence); *Finley*, *supra*, at 556, 107 S.Ct. 1990 (postconviction relief procedures are constitutional if they 'compor[t] with fundamental fairness'). Federal courts may upset a State's postconviction relief procedures only if they are fundamentally inadequate to vindicate the substantive rights provided."

Doc. 27 at 29 (quoting *Osborne*, 557 U.S. at 69, 129 S.Ct. at 2320); *see also Cunningham*, 592 F.3d at 1256 n. 12 (stating that post-*Osborne*, the correct legal standard for evaluating a due process challenge to a state's procedures for post-conviction DNA access is a fundamental fairness standard based on *Medina*); *LaMar v. Ebert*, 756 F. App'x 245, 251-52 (4th Cir. 2018) (citing *Osborne* for proper legal standard to apply in procedural due process challenge to constitutionality of DNA testing law). In *Cunningham*, the Eleventh Circuit observed that while *Osborne* "did

not define a level of process necessary to satisfy the fundamental fairness standard," the Supreme Court considered the fact that Alaska's limitations were similar to those imposed by other states' DNA access procedures and by federal law, "thereby suggesting that the 'fundamental fairness' of a State's procedure for post-conviction relief can be measured by comparison to other jurisdictions."  592 F.3d at 1261-62 (citation omitted).  This analysis is directly in line with the U.S. Supreme Court's analysis in *Cooper*, which *Osborne* does not supersede or replace.  As argued in Ms. Wilson's Motion for Summary Judgment, this Court should begin by examining current practices in jurisdictions outside Alabama.

The majority of states nationwide have adopted a standard of proof for post-conviction access to DNA evidence significantly more favorable to the accused than Alabama's.   Indeed, at least 41 states require a convicted person to meet a "reasonable probability"[3] or similar standard,[4] typically by requiring a showing that

---

[3]     ALASKA STAT. § 12.73.020; ARIZ. REV. STAT. ANN. § 13–4240; ARK. CODE ANN. § 16-112-202; CAL. PENAL CODE § 1405; CONN. GEN. STAT § 54-102kk; D.C. CODE § 22-4133; FLA. R. CRIM. P. 3.853; GA. CODE ANN. § 5-5-41(c); HAW. REV. STAT. ANN. § 844D-123; IND. CODE § 35-38-7-8; IOWA CODE ANN. § 81.10; KY. REV. STAT. ANN. § 422.285; LA. C. CR. P. art. 926.1; MD. CODE ANN., CRIM. PROC. § 8-201; MISS. CODE ANN. § 99-39-5; MO. ANN. STAT. § 547.035; MONT. CODE ANN. § 46-21-110; NEV. REV. STAT. ANN. § 176.0918; N.J. STAT. ANN. § 2A:84A-32a; N.M. STAT. ANN. § 31-1A-2; N.Y. CRIM. PROC. LAW § 440.30(1-a); N.C. GEN. STAT. ANN. § 15A-269; OKLA. STAT. ANN. tit. 22 § 1373.4; ORE. REV. STAT. ANN. § 138.692; R.I. GEN. LAWS § 10-9.1-12; S.C. CODE ANN. § 17-28-90; TENN. CODE ANN. § 40-30-304; TEX. CODE CRIM. PROC. art. 64.03; UTAH CODE ANN. § 78B-9-301; VT. STAT. ANN. tit. 13, § 5561-5566; W. VA. CODE ANN. § 15-2B-14; WIS. STAT. ANN. § 974.07.
[4]     DEL. CODE ANN. tit. 11, § 4504 (requested testing has the scientific potential to produce new non-cumulative evidence materially relevant to movant's assertion of actual innocence); MINN. STAT. ANN. § 590.01 (same); N.D. CENT. CODE ANN. § 29-32.1-15 (same); 725 ILL. COMP. STAT. ANN. § 5/116-3 (same and adding "even though the results may not completely exonerate

there exists a reasonable probability that the applicant would not have been convicted if exculpatory results from the requested testing had been obtained at the time of trial. The same is true in federal court.[5] Four states have no standard.[6] Only a handful of states have adopted a standard higher than reasonable probability, but even those jurisdictions impose a far less onerous burden than does Alabama.[7] "[T]he vast majority of jurisdictions remain persuaded that the heightened standard of proof imposed on the accused" by Alabama "is not necessary to vindicate the State's interest," *Cooper*, 517 U.S. at 360, and have recognized that the reasonable

---

the defendant"); KAN. STAT. ANN. § 21-2512 (testing may produce non-cumulative, exculpatory evidence relevant to claim that petitioner was wrongly convicted or sentenced); NEB. REV. STAT. ANN. § 29-4120 (same); IDAHO CODE ANN. § 19-4902 (testing has the scientific potential to produce new non-cumulative evidence that would show that it is more probable than not that petitioner is innocent); WASH. REV. CODE ANN. § 10.73.170 (petitioner must show likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis); WYO. STAT. ANN. § 7-12-303 (testing has potential to produce new, non-cumulative evidence that will establish movant's actual innocence).

5    18 U.S.C. § 3600(a)(8) (the requested testing may produce new material evidence that would "raise a reasonable probability that the applicant did not commit the offense").

6    These states have threshold requirements, similar to those in other state DNA laws, such as: the evidence exists, the evidence was secured in relation to the investigation or prosecution, and the evidence sought to be tested is material to the issue of the movant's identity as the perpetrator of, or accomplice to, the crime. ME. REV. STAT. ANN. tit. 15, § 2138; MASS. GEN. LAWS ch. 278A, § 7; MICH. COMP. LAWS ANN. § 770.16; S.D. CODIFIED LAWS § 23-5B-1.

7    COLO. REV. STAT. ANN. §18-1-413; N.H. REV. STAT. ANN. § 651-D:2; OHIO REV. CODE ANN. § 2953.74; 42 PA. STAT. AND CONS. STAT. § 9543.1; VA. CODE ANN. § 19.2-327.1. Notably, the Recommendation cites to *McDaniel v. Suthers*, 335 F. App'x 734 (10th Cir. 2009) for the proposition that the "clear and convincing" standard of the Colorado statute has "survived constitutional scrutiny." Doc. 65 at 15, fn. 6. That decision, however, merely cites to *Osborne*, then a recently-decided decision, for the proposition that states can establish rules around post-conviction relief, and does not offer analysis of this specific standards in the Colorado statute. *See McDaniel*, 335 F. App'x at 736. The mere language "clear and convincing" alone is not, of course, the issue at hand. Rather, the fairness of that standard in context of the other requirements of the statute must be considered.

probability standard safeguards the liberty interest of the convicted persons to access DNA evidence that can prove their innocence.

An examination of how the reasonable probability standard has been construed in several jurisdictions demonstrates the fundamental unfairness inherent in Alabama's heightened burden of proof and was included in the brief supporting the motion for summary judgment.  Doc. 40 at 18-25.  The Recommendation's disregard of this argument and precedent was in error.

> **2.    Contrary to the Recommendation's Findings, Plaintiff has Demonstrated that Alabama's Burden of Proof is Unconstitutional in All Circumstances.**

The Recommendation also determined, in contradiction to the record before the Court, that Plaintiff had not demonstrated that the Alabama statutory scheme was unsuccessful in all circumstances.  Doc. 65 at 31-33; *id*. at 32, fn. 14.  This factual finding is belied by the ample record Plaintiff included in her summary judgment pleadings about the other 22 cases in which litigants sought DNA testing under the statutory scheme at issue.  *See* Doc. 40 at 36-37, fn's 16 & 17.

As listed in the Brief Supporting Motion for Summary Judgment, after a diligent search, Ms. Wilson located 22 cases, including hers, since the enactment of Ala. Code § 15-18-200 where an individual convicted of a capital offense filed a motion pursuant to the statute for post-conviction DNA testing.  *See* Doc. 40 at 36-37, fn's 16 & 17.  Only three were granted.  *See* Doc. 40, Ex's 5, 6, 8 & 9.  In none

of those three written orders did the courts engage in any analysis as to how exculpatory results from the requested testing would demonstrate the factual innocence of the applicant.  In fact, the orders granting testing were visibly devoid of any legal analysis or reasoned construction of the legal burden, much like the statutory language itself, further supporting the conclusion that Alabama's rule is arbitrary and fundamentally unfair in operation.

Alabama courts have authoritatively construed the state's burden of proof to deny testing in other cases on similarly high grounds.  *Cf.* Doc. 65 at 12-15.  In *Ex parte Hammond*, 93 So. 3d 172 (Ala. Crim. App. 2012), the Court of Criminal Appeals denied the petition, holding that Hammond failed to show he was entitled to post-conviction DNA testing.  *See* Doc. 40 at 41-45.  The Court held that testing of the evidence would not demonstrate his innocence but "at most" would show that an alternate perpetrator "may have touched the items."  *Hammond*, 93 So. 3d at 177 ("Even proof that someone else's DNA might appear on some unspecified physical item at the crime scene does not exclude [defendant] as the perpetrator of the crime.") (quoting *State v. El-Tabech*, 259 Neb. 509, 530, 610 N.W.2d 737, 751 (2000)).[8] *Hammond* sets forth the Alabama Court of Criminal Appeals' authoritative

---

[8]     The Court of Criminal Appeals stated that

> Hammond bears the burden of establishing by a reasonable probability that he is entitled to postconviction DNA testing. *See* § 15–18–200(f)(2), Ala. Code 1975. "A reasonable probability is a probability sufficient to undermine confidence in the

construction of the standard of proof in § 15-18-200(f)(2).  That construction fails to recognize that a redundant DNA profile on multiple items of probative evidence excluding Hammond and coming from the alternate perpetrator would not merely have suggested that alternate perpetrator touched those items; rather, it would show intimate involvement with the instrumentalities of the crime, producing exculpatory evidence that would exonerate Hammond.

This exact construction was applied by the state court to deny testing in Ms. Wilson's case.  *See State v. Wilson*, CC-1992-001194.00, Order (Madison County, Aug. 2011) ("Even if other DNA specimens are present on the evidence requested for forensic DNA testing, this would not, on its face, exonerate James White or [Betty Wilson] of the murder" and concluding that there is no reasonable possibility that the testing will produce exculpatory evidence that would exonerate the defendant); *see also State v. Suttle*, CC-1997-004130.00, Order (Jefferson County, Mar. 2015), Doc. 40, Ex. 13 (denying testing of telephone cords used to strangle victim "[g]iven the time which has passed and the number of individuals who have necessarily handled this evidence, as well the unlikelihood of any probative DNA

---

outcome." *Strickland v. Washington,* 466 U.S. 668, 693, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

*Id.* at 177.  Despite this apparent invocation of the reasonable probability standard, the court did not change the burden set forth in (f)(2).  The court simply said that Hammond must show by a reasonable probability that he is entitled to testing*, i.e.,* that he meets the statutory burden under (f)(2).

on the porous surface of the cord," finding that any results from testing cords would not exonerate petitioner; denying further testing of victim's fingernail clippings and holding that "[e]ven if the DNA of another living, viable male had been identified from the [victim's fingernail] clippings," it could be consistent with an accomplice being present at the crime and would not prove factual innocence, and finding no reasonable possibility that testing of any evidence in the case would produce exculpatory evidence which would exonerate petitioner), *petition for writ of mandamus denied*, *Ex parte Suttle,* 213 So. 3d 660 (unpublished order) (Ala. Crim. App. June 24, 2015), Doc. 40, Ex. 14 ("[a]t most, further DNA testing might show that another male may have been involved in the murder, which would not exonerate Suttle") (citing *Hammond*), *petition for writ of mandamus denied* (unpublished order) (Ala. Aug. 12, 2015), Doc. 40, Ex. 15.[9]  In so construing Alabama's DNA law, these courts considered a highly limited category of results that, on the specific facts of these cases, were not exculpatory.  The facts of *Hammond* and *Suttle* are distinguishable: unlike physical connections between the defendants in those cases and the physical evidence in question, there is no evidence tying White to the instrumentalities of the crime that Ms. Wilson has moved to test.  There is also no

---

[9]      The decisions in *Hammond* and *Suttle* are the only court decisions besides her own, among the 22 cases Ms. Wilson has located, that provide any reasoning to determine whether Alabama's burden of proof was satisfied.

evidence that White had an accomplice.  Any redundant, male DNA on crime scene evidence that excludes the victim likely came from the assailant.

The Recommendation also reads *Hammond* and *Suttle* as purely "reasonable probability" cases and treats these decisions as authoritative constructions that put the Alabama statute squarely in the majority of states that require only a reasonable probability of exculpatory results for a litigant to receive testing.  Doc. 65 at 12-15. This conclusion misreads the factual underpinnings of those cases and the text of the cases themselves.  As described *supra*, in *Hammond* the Appellate Court did not cabin the statutory standard as simply requiring a showing, by a reasonable probability, that the DNA results would be exculpatory.  Instead, the Court restated that Hammond needed to show, by a reasonable probability, that he was entitled to postconviction testing under § 15-18-200(f)(2).  *Hammond*, 93 So.3d at 177. Similarly, in *Suttle* the Court defined the standard as requiring a showing, by a reasonable probability, that the petitioner is entitled to postconviction DNA testing, and that such testing will exonerate the petitioner, "[p]ursuant to § 15-18-200(f)(2)." *Suttle*, 213 So.3d 660.

The Recommendation ignores that neither case does anything to resolve the underlying constitutional problem with the statute, that Ala. Code § 15-18-200 permits a court to reject the potential exculpatory results posited by the applicant, thereby allowing courts to deny testing while staying within the confines of

subsection (e)(3)'s mandate by assuming an exclusion.  The opinions in both cases bear this out – in *Hammond* and *Suttle*, the Alabama courts authoritatively construed the Alabama statute to bar relief for petitioners where there were some specific outcomes of the testing that might not be exculpatory, while ignoring the other potential outcomes those petitioners identified that would exculpate them.

Such a construction is nothing short of oppressive.  *Compare Hammond, Suttle,* and *Wilson* with *Payne*, 129 A.3d 546, 561-63 (Pa. Super. Ct. 2015) (inquiry is "not whether a particular result, or category of results, would entitle [movant] to a new trial" and rejecting suggestion "to consider only [the limited number of] potential results of DNA testing that are, *in the context of the specific facts of this case, not exculpatory*") (emphasis added); *Peterson*, 836 A.2d 821, 827 (N.J. Super. Ct. App. Div. 2003)("[T]here may be a variety of 'favorable' results of DNA testing, some of which would not raise a sufficient question . . . but others of which would raise such serious doubt concerning the fairness of the trial and a convicted person's guilt that a new trial would be required."); *Powers*, 343 S.W.3d 36, 55 (Tenn. 2011) (courts should "postulate whatever realistically possible test results would be *most favorable*" to petitioner in determining whether burden of proof is satisfied) (quoting *Peterson*, 836 A.2d at 827) (emphasis added)).

The Recommendation ignores the meaning of these cases, essentially concluding that Ms. Wilson's case can be distinguished in some way because she

was never accused of being the actual perpetrator.  This difference is ultimately an irrelevant one.  The State's theory at trial was that Ms. Wilson hired White alone to kill her husband.   DNA testing could detect the same foreign DNA profile on multiple items of probative evidence, such as the inside of the ski mask, the hair in the victim's hand, and the handle of the baseball bat, and develop a redundant profile that excludes Mr. White and the victim, and potentially reveal who committed this crime through a CODIS search.[10]  Such results would undermine the State's theory of the case, deal a devastating blow to the jury's verdict, and constitute evidence that

---

[10]      Redundant DNA results have led to many exonerations.  *See, e.g.,* Innocence Project, Stephan Cowans, *at* https://www.innocenceproject.org/cases/stephan-cowans/ (Cowans was exonerated in Massachusetts after post-conviction DNA results showed the same unknown male profile on baseball hat that assailant left behind, sweatshirt that he wore, and glass mug that he drank from that excluded Cowans; Cowans served six years in prison for a crime he did not commit); David Weber & Kevin Rothstein, *Man freed after 6 years; Evidence was flawed*, Boston Herald, Jan. 24, 2004; Kim North Shine, *DNA Tests Exonerate Man After Nearly a Decade in Prison, Suspect is to be Set Free*, Detroit Free Press, June 12, 2003 (Kenneth Wyniemko was exonerated in Michigan after post-conviction DNA testing on victim's fingernail scrapings, saliva on cigarette butt, and nylons stuffed into victim's mouth identified redundant unknown male profile that excluded Wyniemko; test results led prosecutor to state that "[Wyniemko] is absolutely innocent");  Innocence      Project,   The      Cases,      Kenneth      Wyniemko,      at https://www.innocenceproject.org/cases/kenneth-wyniemko/ Kim North Shine, *Freed by Science, He Celebrates: DNA Tests Exonerate a Man Convicted of Rape and Robbery,* Detroit Free Press, June     18,     2003;     Innocence     Project,     The     Cases,     Alan     Northrop,     *at* https://www.innocenceproject.org/cases/alan-g-nothrop/      and     Larry     Davis,     *at* https://www.innocenceproject.org/cases/larry-w-davis/ (Larry Davis and Alan Northrop were exonerated in Washington after post-conviction DNA testing of victim's fingernail scrapings and pubic hair comb identified DNA profiles of two unknown men, excluding Northrop and Davis; the men each spent 17 years in prison for a crime they did not commit); L. McVicker, *1993 Rape Charges Officially Dropped*, The Columbian, July 14, 2010.

Ms. Wilson did not hire White[11] to commit the murder and is actually innocent.[12]

Contrary to the conclusions reached in Recommendation, this is quite similar to the

scenario in *Payne* where the state appellate court affirmed the trial court's granting

of DNA testing for Payne, who alleged the absence of his DNA and the presence of

DNA from someone who matched a state or national database may reveal the identity

---

[11] The Recommendation states that "White's presence was never an issue at trial because he confessed to being there and committing the murder." Doc. 65 at 23. That ignores White's recantation which could be presented in tandem with DNA test results that exclude White. The Recommendation's conclusion that White "indicated he was wearing gloves when he murdered Wilson's husband, so the absence of his DNA on the bat would tell the jury nothing new" again ignores the fact that White has recanted this testimony and ignores the fact that Ms. Wilson has not moved for DNA testing simply to show an absence of DNA. *See id*. Rather, she has moved for testing to develop the redundant male profile left behind by the actual perpetrator on multiple items of evidence, not just the bat. *See*. Doc. 1 at 20 (requesting DNA testing on: the baseball bat; the victim's bloodied fingernail clippings; the ski mask; the hairs found inside the ski mask; the victim's bloody clothing; cigarette butts found at the scene; the bloodstained carpet sample found near the victim's body; and the hairs collected from the victim's right hand). That redundant male profile could belong to someone previously or subsequently convicted of similar violent crimes in the community, or beyond.

[12]       Indeed, the Eleventh Circuit has discussed how redundant DNA results can establish innocence.

> [W]e cannot say that there is absolutely no possibility that DNA testing of the biological evidence could help Cunningham establish that he was innocent of the rape charge. Although we seriously doubt, for reasons we will explain more fully later, that the testing of any one of the individual items to which Cunningham seeks access could raise questions about his guilt, it is theoretically possible that testing all of them might do so. For example, if the *same DNA profile* were found on the *condom wrapper from the crime scene* and on *either* the *pubic hairs* from [the victim]'s pubic combings or in the *fingernail scrapings* (if any exist), and that DNA profile did not match his own, that would be *evidence that Cunningham is not the rapist*.

*Cunningham*, 592 F.3d at 1256 (emphasis added).

of the real killer.  *Cf.* Doc. 65 at 27, fn. 13.  In granting testing, Pennsylvania courts did indeed "construe their statute more favorably to the accused."  *Id*.  As stated in *Payne*:

> Similarly, if the DNA results were to match some heretofore unknown culprit with a history of burglary-murders which bear a striking resemblance to the killing of [the victim], and further investigation reveals that person had the opportunity to commit this crime, such results could easily allow [the defendant] to demonstrate the unreliability of the jury's verdict *in toto*.

*Payne*, 129 A.3d at 562.  The court in *Payne* continued:

> We must emphatically state that, with respect to the burden on a [Pennsylvania post-conviction DNA] petitioner, "no reasonable probability" does not mean, "no likely probability." It should go without saying that the most *likely* result of Section 9543.1 DNA testing will corroborate a petitioner's guilt, confirm it outright, or simply fail to cast significant doubt on the verdict. However, the very purpose of Section 9543.1 must be to afford a petitioner the *opportunity* to demonstrate the unlikely.  The threshold question is, therefore, not the likelihood of proof of innocence, but whether it is within the realm of reason that some result(s) could prove innocence.

*Id*. at 563; *see also Wade*, 2019 WL 2084533, at *14.

Where a prisoner convicted of a capital offense has filed a motion for post-conviction DNA testing under Alabama's DNA statute, physical evidence collected in the case has been located, DNA testing was not available at the time of trial, and the identity of the perpetrator was a key issue at trial, to reject the potential

exculpatory results that would be most favorable to the prisoner and instead presuppose the least favorable outcome of a DNA exclusion gives the court broad discretion to assume the meaning of the results before the testing has even occurred. This is a denial of due process.  *See Wade*, 2019 WL 2084533, at *15.  Were this standard to apply in other states, numerous men and women who have proved their innocence through DNA testing would still be in prison today.[13]

---

[13]      *See, e.g., In re. Morton*, 326 S.W.3d at 641, 644  (reversing denial of testing of blood-stained bandana recovered from behind victim's house; assuming exculpatory results theorized by appellant Morton that testing might show victim's blood, DNA of a person other than appellant, and none of appellant's DNA; and rejecting State's argument that it is unlikely that testing of bandana would lead to such an exculpatory result).  Indeed, DNA testing in Morton's case revealed that the bandana contained the victim's blood and the DNA of an unknown male.  That unknown male profile was run in CODIS and "hit" to a convicted offender.  Authorities used the profile to implicate the same man in a similar murder that occurred in a neighboring county.  The CODIS hit thus exonerated Morton, identified his wife's true murderer, and helped solve an additional unsolved murder.  In 2011, Morton was released after spending 25 years in prison for a crime he did not commit.  *See* Brandi Grissom, *DNA Evidence Leads to Morton's Release After 25 Years*, TEXAS TRIBUNE, Oct. 4, 2011; Chuck Lindell, *Morton Freed from Prison After 25 Years*, AUSTIN AMERICAN-STATESMAN, Oct. 4, 2011; Innocence Project, Michael Morton, *at* https://www.innocenceproject.org/
cases/michael-morton/; *see also Hardin v. Commonwealth*, 396 S.W.3d 909, 913, 915 (Ky. 2013) (reversing denial of testing of hairs (where trial court concluded that identifying hairs in victim's hand would not exonerate either appellant and that there was nothing new to be learned from DNA analysis that could exculpate either appellant); finding that unidentified hairs might match to alternate suspect or to another individual in FBI database; rejecting State's argument that even if hairs are shown to belong to alternate suspect it would only incriminate a third person and not exculpate appellants, where State's theory at trial was that appellants acted alone and State presented no evidence of third party involvement; and holding that evidence admitted into criminal trials belongs to the Commonwealth, not the Commonwealth's Attorney, who is charged with the duty to preserve and protect its integrity, "not to hoard it").  Hardin and Clark's convictions were vacated as a result of DNA testing and all charges were dismissed; both men were released from prison after serving over 20 years for a murder they did not commit.  *See* National Registry of Exonerations, *at* https://www.law.umich.edu/special/
exoneration/Pages/casedetail.aspx?caseid=5285.

In assessing who should have access to the advancements of scientific testing made in the quarter of a century since this case went to trial, Alabama has drawn an arbitrary, oppressive, and fundamentally unfair standard that deprives individuals who were intended to benefit from the law a meaningful opportunity to vindicate the liberty interest the law provides.  Ms. Wilson has shown that Alabama's DNA statute, as authoritatively construed, violates her federal constitutional right to procedural due process.

> **3.  The Recommendation Erred in Concluding that *Cunningham* and *Cromartie* Bless the Alabama Framework**

The Recommendation ignores or rejects the cases that Plaintiff identified as critical to a due process analysis, and instead concludes that because, in its view, the Supreme Court in *Osborne* and then the Eleventh Circuit in *Cunningham* and *Cromartie* approved "provisions requiring that DNA results establish actual innocence—under reasonable probability standard or the more arduous clear and convincing standard," the standard at issue in this case does not violate due process. Doc. 65 at 20.   The conclusion that these cases support the Recommendation is simply incorrect.

First, the Alaska statute at issue in *Osborne* is not the same as Alabama's – Alaska's standard does not have either the failsafe Plaintiff discusses in her summary judgment pleadings, or the additional requirement that a movant demonstrate that the evidence is in a condition to be tested.  In fact, the Supreme Court in *Osborne*

recognized that Alaska's procedures were similar to those provided by other states' DNA evidence laws and by federal law. *Osborne*, 557 U.S. at 70; *see also Cunningham*, 592 F.3d at 1261-62. Moreover, the Court did not really decide this issue in *Osborne* – rather, the Court took issue that the petitioner "attempt[ed] to sidestep state process," in seeking federal relief. *Osborne*, 557 U.S. at 70, 71.[14]

Neither *Cunningham* nor *Cromartie* direct this Court to deny Plaintiff relief, either. *Cunningham* was decided on the basis of Alabama's Rule 32 post-conviction discovery process (his was a non-capital case and so he could not seek relief under the DNA testing statute), and was an as-applied challenge, not a facial challenge. *Id.*, 592 F.3d at 1252. It merely held that Rule 32's requirement that a movant demonstrate "good cause" for a discovery request, including a request forensic

_____

[14] The Recommendation also claims, in a footnote, that the Fifth Circuit in *Gutierrez v. Saenz*, 818 F. Appx 309 (5th Cir. 2020), *vacated by* 141 S. Ct. 1260, recognized that the "clear and convincing standard" in *Osborne* was constitutionally appropriate.   Doc. 65 at 16-17, fn.7.   As the Recommendation acknowledged, however, all *Gutierrez* did was affirm that a reasonable probability standard is constitutionally appropriate (as would be a "sufficiently material" standard, how the Fifth Circuit treated the *Osborne* holding).   *Gutierrez*, 818 F. App'x at 312 (citing *Osborne*, 557 U.S. at 70.)   As described *supra*, the Supreme Court in *Osborne* never affirmed a particular standard, but the Alaska standard is not, as the Recommendation claimed, a "clear and convincing evidence" one.   The *Osborne* opinion acknowledges not only the Alaska statutory standard of clear and convincing evidence to receive post-conviction discovery, but the additional route to DNA testing under the Alaska constitution that would give a petitioner access to DNA testing if they could show that (1) a conviction rested primarily on eyewitness identification evidence; (2) there was demonstrable doubt of the defendant's identification as the perpetrator; and (3) that scientific testing would likely be conclusive on this issue.   *Osborne*, 557 U.S. at 64 (2009); *Cf.* Recommendation at 19-20.   This is a reasonable probability standard, and a standard that, treating White as an eyewitness through his inculpatory—and now recanted—statement, would entitle Ms. Wilson to DNA testing if it were the standard in Alabama.

testing, did not run afoul of *Osborne*.  592 F.3d at 1264-66.  Moreover, like in *Osborne*, Cunningham lost because he was procedurally barred from pursuing his request for DNA testing through Rule 32 because his request was untimely.  *Id.* at 1269-71.  The Court explicitly left unaddressed whether the materiality requirement of Rule 32 satisfied due process.  *Id.* at 1270-71 ("Alabama case law offers no guidance about whether a request for forensic testing would satisfy Rule 32.1(e)(5)'s materiality requirement in a situation where a conclusive exculpatory result is theoretically possible but is improbable given the condition of the biological samples and the overall weight of other evidence of guilt. . . . Because no Alabama court has had the opportunity to consider Cunningham's claim, we need not decide whether such an application of Rule 32's materiality requirement would violate due process in his case.").  In sum, the Recommendation is simply wrong that *Cunningham* endorsed Rule 32 procedures that are "similar" enough to the DNA testing framework to be precedential here.  *Cf.* Doc. 65 at 19, fn.9.

*Cromartie* is equally unavailing.  As the Recommendation acknowledged, in *Cromartie* the Eleventh Circuit evaluated Georgia's forensic testing statute, not Alabama's.  And as *Cromartie* makes clear, the standard it was approving was a requirement simply that a person seeking testing show that "the favorable DNA testing results create a reasonable probability that he would have been acquitted had those results been available at trial."  *Cromartie v. Shealy*, 941 F.3d 1244, 1256 (11th

Cir.), *cert. denied*, 140 S. Ct. 519, 205 L. Ed. 2d 332 (2019) (citing Ga. Code Ann. § 5-5-41(c)(3)(D)).  If that was the standard in Alabama, Ms. Wilson wouldn't be before this Court – this standard is demonstrably lower than the Alabama standard and, pursuant to *Cooper* and *Osborne,* in keeping with the 41 states in the United States that adopt a reasonable probability standard.  Neither of these cases give the Alabama testing regime an imprimatur of constitutionality.

> **4.    The Recommendation Erred in Concluding That the Pennsylvania Statute and the *Wagner* Decision Support a Grant of Summary Judgment to Defendants.**

The Recommendation rejected Plaintiff's argument that the Court should look to other states in assessing whether the Alabama statutory framework violates due process, but simultaneously did try to look to other states to identify similar statutory frameworks of which it believed courts had approved, particularly in Pennsylvania. The Recommendation's analysis on this score looked only at *Wagner v. Dist. Att'y Allegheny Cty*., Pa., No. CIV.A. 11-762, 2012 WL 2090093, (W.D. Pa. May 21, 2012), report and recommendation adopted sub nom, *Wagner v. Dist. Att'y of Allegheny Cty., Pa.*, No. CIV.A. 11-762, 2012 WL 2089799 (W.D. Pa. June 8, 2012) and ignored more recent decisions that explain why the Alabama statute is unconstitutional.

As Plaintiff argued in her motion for summary judgment, a recent decision on a procedural due process challenge to Pennsylvania's DNA law is highly instructive.

In *Wade v. Monroe Cty. Dist. Attorney*, C.A. No. 3:15-cv-00584, 2019 WL 2084533, at *1, *9, *16 (M.D. Pa. May 13, 2019), vacated and remanded, 800 F. App'x 114 (3d Cir. 2020), cert. denied, 141 S. Ct. 344 (2020), a federal district court granted judgment in favor of a Pennsylvania state prisoner on his claim, under 42 U.S.C. § 1983, that the State's refusal to release to him evidence from his case for DNA testing violated his due process rights under the Fourteenth Amendment.  At issue was Pennsylvania's post-conviction DNA law, which provides in pertinent part:

> The court shall not order the testing requested . . . if, after review of the record of the applicant's trial, the court determines that there is no reasonable possibility . . . that the testing would produce exculpatory evidence that . . . would establish the applicant's actual innocence.

42 Pa. Stat. and Cons. Stat. Ann. § 9543.1(d)(2).  The court explained:

> The statute itself does not define the term "actual innocence," but Pennsylvania state courts have adopted the definition of "actual innocence" articulated by the Supreme Court of the United States in *Schlup v. Delo*, 513 U.S. 298 (1995): "namely, that the newly discovered evidence must make it 'more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt.'" *Commonwealth v. Conway*, 14 A.3d 101, 109 (Pa. Super. Ct. 2011) (quoting *Schlup*, 513 U.S. at 327); *see also In re Payne*, 129 A.3d 546, 556 (Pa. Super. Ct. 2015) (quoting *Conway*, 14 A.3d at 109).

*Wade*, 2019 WL 2084533, at *10.  In his state post-conviction motion for DNA testing, the petitioner Robert Wade had requested testing of various items of evidence, including the victim's fingernail clippings, the victim's clothing (the

victim's pantyhose and underwear were pulled down to her ankles and Wade noted that her sweater was on backwards, suggesting that the victim had been redressed by the assailant), and the trash bag in which the victim's body was found.  *Id*. at *11, *14.  To meet Pennsylvania's requirement that he present a *prima facie* case that DNA testing of the evidence, assuming exculpatory results, would establish his actual innocence, *see* 42 Pa. Stat. and Cons. Stat. Ann. § 9543.1(c)(3), Wade postulated that touch DNA testing—a technology not available at trial—for epithelial (skin) cells on the evidence might reveal a source other than himself and the victim which would be *prima facie* proof that someone else committed the murder for which he was convicted.  *Wade*, 2019 WL 2084533, at *10-11, *14.  He advanced three theories: a redundancy theory (if DNA tests revealed the same profile on multiple items connected to the crime, the results would give rise to an inference of a separate assailant); a databank theory (DNA results that identify a foreign profile can be run through the state and federal databanks and could lead to the identification of a separate assailant); and a confession theory (an individual identified by the databank could, when confronted with the DNA results, confess to the crime).  *Id*. at *11.  The state court rejected his argument that exculpatory results from touch DNA analysis would establish his actual innocence as "speculative and irrelevant" and denied his motion, *inter alia*, on the basis that there was no reasonable possibility that the testing would produce exculpatory evidence that would establish his actual

innocence.  *Id.* at \*13, \*15.  That denial was affirmed on appeal.  *Id.* at \*13.  Wade's petition for allocatur with the Supreme Court of Pennsylvania was summarily denied.  *Id.*

Wade then commenced a § 1983 action in federal court.  *Id.* at \*8.  He sought injunctive relief only, that is an order from the court directing the District Attorney's Office to release the evidence for DNA testing.  Following discovery and the denial of dispositive motions, the case was submitted, by agreement of the parties, for a bench trial on the papers under Fed. R. Civ. P. 52(a).  *Id*. at \*4.  The district court stated:

> The question properly before us is a narrow one:  Whether the Pennsylvania post-conviction DNA testing statute, as construed by the state courts in Wade's case, "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental, or transgresses any recognized principle of fundamental fairness in operation." *Osborne*, 557 U.S. at 69; *see also Wagner*, 2012 WL 2090093, at \*15.

*Id*. at \*14.  The district court held that, by rejecting Wade's argument as "speculative" and a "bald assertion that touch DNA [from a third person] will be recovered from the items of evidence," the state court construed Pennsylvania's DNA statute to "read the critical words 'assuming exculpatory results' entirely out of the statute, effectively foreclosing *any possibility whatsoever* of relief."  *Id*. at \*15 (emphasis in original).

> By interpreting the statute in this fashion, requiring Wade to do the impossible (prove that DNA testing would produce exculpatory results without access to the very evidence he seeks to test) and in contravention of an express statutory presumption that DNA testing would indeed produce exculpatory results, Wade has been denied the opportunity promised by this statute to demonstrate his actual innocence. We find this to be fundamentally unfair and a violation of Wade's federal constitutional right to procedural due process. *See Osborne*, 557 U.S. at 69; *Wagner*, 2012 WL 2090093, at *15.

*Id*. at *15.  In a footnote the court added:

> If this interpretation of the statute . . . were applied to other applicants, they too would be utterly foreclosed from obtaining relief. The prospect of relief under DNA testing procedures that require, as a threshold matter, proof that the requested DNA testing will produce exculpatory results to obtain that DNA testing in the first instance is circular and entirely illusory.

*Id*. at *15 n.11.  The court underscored the importance of assuming that DNA tests

will generate the results that the applicant has advanced:

> [W]e note that, assuming the exculpatory results posited by Wade and ignored by the state courts—DNA evidence that a third person, other than Wade, had touched her sweater, her bra, her pantyhose, her underpants, and the inside of the trash bag in which she was found—it is difficult to imagine a scenario in which a reasonable juror would have found him guilty beyond a reasonable doubt, notwithstanding the quantum of circumstantial evidence arrayed against him. Although the prospect of obtaining such an overwhelmingly favorable result from touch DNA testing is unlikely, as we noted above, the intent of the Pennsylvania statute is to afford the applicant an *opportunity* to demonstrate the unlikely.

*Id*. at *15 n.12 (emphasis in original).  The court concluded that Pennsylvania's law, on its face, afforded a fair procedure for seeking relief, but that "the particular – and peculiar – construction" of the statute by the state court in Wade's case was fundamentally unfair.  *Id.* at *14.

The Recommendation focused on this conclusion (that on its face the statute was constitutionally acceptable), as evidence that the district court's decision forecloses a facial challenge for Ms. Wilson here.  Doc. 65 at 25, fn.12.  But the Recommendation missed the point.  To the extent *Wade* involved an as-applied challenge, its ruling is nonetheless instructive here, both because Ms. Wilson preserves her as-applied challenge, and because the court's reasoning is applicable even in assessing the constitutionality of the statute as written.  *Wade*'s holding that Pennsylvania's statute, as written, provides a fair procedure was premised on the Pennsylvania state courts' "repeated[ ] recogni[tion] . . . [that] 'the statute does not require [a] petitioner to show that the DNA testing results would be favorable.'"  *Id.* (citing Pennsylvania state court decisions).  This is not the case in Alabama, a fact the Recommendation ignores.  Alabama's law, on its face, requires a convicted person to meet a virtually impossible standard, *and*, unlike in Pennsylvania, there are no reasoned state court interpretations of that standard to the contrary.  *Cf. id.* ("The threshold question [under the Pennsylvania statute] is . . . not the likelihood of proof of innocence, but whether it is within the realm of reason that some result(s)

could prove innocence.") (quoting *In re Payne*, 129 A.3d at 563).  Absent any similar

authoritative construction, Ms. Wilson and other Alabama DNA applicants are faced

with the plain language of § 15-18-200(f)(2), which, as written, allows Alabama

state courts to reject the exculpatory DNA results advanced by the applicant that

subsection (e)(3) mandates be presumed.  This statutory language violates principles

of fundamental fairness.

The "reasonable probability of a different result" standard is not analogous to

Ala. Code § 15-18-200.  First, if this were true, that standard or some version thereof

would be written into Alabama's law.  Every jurisdiction that adopts the reasonable

probability standard has that requirement expressly written into the law,[15] and courts

in those jurisdictions have decided motions for post-conviction testing based on that

benchmark.  No such language appears in Alabama's law.  Second, "reasonable

probability" is a materiality standard; it is the degree by which the applicant must

---

[15]    Defendants claimed in their summary judgment briefing that Iowa, Louisiana and South
Carolina do not adopt a reasonable probability standard.  (Defs.' Resp. at 39 n.1.)  Defendants are
wrong.  *See* IOWA CODE ANN. § 81.11(1)(e) (DNA results would raise a "reasonable probability"
that defendant would not have been convicted if such results had been introduced at trial); LA. C.
CR. P. art. 926.1(C)(1) ("reasonable likelihood" that testing will resolve an articulable doubt as to
the guilt of the defendant and establish innocence); S.C. CODE ANN. § 17-28-90(B)(5) (exculpatory
DNA results will constitute new evidence that "will probably change the result of the applicant's
conviction").  Defendants correctly stated that Texas removed the reasonable probability language
from its law.  (Defs.' Resp. at 58.)  *See* TEX. CODE CRIM. PROC. art. 64.03(a)(2)(A) (movant must
show by a preponderance that he would not have been convicted if exculpatory DNA results had
been obtained).  The intent of amending the law was "to clarify that the defendant does not have
to meet two burdens. . . . the Legislature did not intend for [him] to have to prove 'actual innocence'
(a principle under habeas law) in order to meet his burden to have the test done."  *Smith v. State*,
165 S.W.3d 361, 364 (Tex. Crim. App. 2005) (quoting House Committee Bill Analysis).  "The bill
clarifies . . . the standard of proof with regard to getting a DNA test."  *Id.* (quoting same).

make a showing of innocence in those jurisdictions. Pennsylvania's statute requires applicants to explain how there is a reasonable possibility that testing would produce exculpatory evidence that would establish innocence 42 Pa. Stat. and Cons. Stat. Ann. § 9543.1(a)(6)(i)).[16] Florida's rule requires the movant to explain how DNA testing will "exonerate" him. Because the rule "does not define 'exonerate' *or provide a standard to be applied,*" Florida appellate courts have construed this requirement to be met if the movant alleges facts demonstrating a reasonable probability that he would have been acquitted if the results had been available at trial.[17] *See also Cunningham v. Dist. Atty's Office for Escambia Cnty.*, 592 F.3d

---

[16]     The following distinction cannot be understated. Section 9543.1(a)(6)(i) in Pennsylvania's law requires the movant to allege a reasonable possibility that favorable DNA results would establish his actual innocence. This procedural rule requires applicants to meet a materiality standard, one which safeguards their liberty interest to access DNA evidence that can prove their innocence. Pennsylvania also provides circumstances under which the court shall not order testing. *Id*. § 9543.1(d)(2)(i) (court shall not order testing if there is no reasonable possibility that testing would produce exculpatory evidence that would establish actual innocence). Read together, the materiality standard goes hand in hand with the mandatory denial; both mirror in language. In contrast, Ala. Code § 15-18-200(f)(2) contains prescriptive language highly similar to Pennsylvania's § 9543.1(d)(2)(i), *but without any concomitant provision akin to § 9543.1(a)(6)(i)'s materiality standard*. This omission strips Alabama's law of critical meaning and deprives the Alabama defendant of the protections that the missing materiality standard necessarily affords. Absent the attendant context-carrying materiality standard, the stand-alone provision in § 15-18-200(f)(2) is inherently suspect, completely arbitrary and a denial of due process.

[17]     *Knighten v. State*, 829 So. 2d 249, 251-52 (Fla. Dist. Ct. App. 2002) (emphasis added). In *Knighten*, the Florida court of appeals "conclude[d] that in order for the rule (and statute) to be internally consistent the same standard must be applied at both steps of the procedure." *Id*. at 251-52. The court stated:

> Therefore we hold that a claim is facially sufficient with regard to the exoneration issue if the alleged facts demonstrate that there is a reasonable probability that the defendant would have been acquitted

1237, 1270 (11th Cir. 2010) (non-capital defendant seeking post-conviction DNA testing in Alabama must show that potential results would establish that he is innocent "to a sufficiently compelling degree that the 'result probably would have been different' if the evidence had been presented at trial") (citing Ala. R. Crim. P. 32.1(e)(4), (5)); Doc. 50 at 5, fn. 6 (Louisiana's "reasonable likelihood" standard "describes how strong the possibility must be" that exculpatory results will lead to the legal conclusion of innocence) (citation omitted).

Alabama, by contrast, provides no such yardstick. It is not the case that Ms. Wilson has failed to acknowledge that "DNA testing alone does not always resolve a case…where there is enough other incriminating evidence…." Doc. 65 at 21, *citing Osborne* 557 U.S. at 63. Rather, as written, Alabama's law requires the applicant to state how testing "would prove [her] factual innocence" and make a *prime facie* showing that DNA results would "demonstrate [her] factual innocence." Ala. Code §§ 15-18-200(e)(1), (e)(3), while providing no associated materiality

---

> if the DNA evidence had been admitted at trial. We believe that this reading of the rule and statute is consistent with their purpose which, as we recently noted, "is to provide defendants with a means by which to challenge convictions when there is 'credible concern that an injustice may have occurred and DNA testing may resolve the issue.'"

*Id*. at 252. Contrary to the Recommendation's assertion that "Wilson cites no legal authority… illustrating how the absence of matching standards violates an applicant's due process rights," the court's holding in *Knighten* that the same standard must be applied goes directly to the fairness of a law in application. *Id*. at 251-52. And the Recommendation was wrong to conclude that *Knighten*'s holding was not based on due process considerations. *Cf*. Doc. 65 at 29.

standard by which to "demonstrate factual innocence." Without a point of reference, Alabama courts are left to fall back on subsection (f)(2) as the pseudo legal burden by which to determine whether testing should be granted. This is, in fact, how Alabama's law has operated, with courts affording no meaningful, reasoned construction of the standard that the applicant must meet to prove that she is factually innocent or that DNA results would "exonerate." (*See* Doc. 40 at 44-47.) In the absence of a standard that sufficiently protects the defendant's liberty interest, in circumstances where the criminal defendant's right to prove that she has been imprisoned as an innocent woman is at stake, Alabama's DNA law, as written and in practice, results in arbitrary opinions and denies those who are intended to benefit from the statute a meaningful opportunity to vindicate the substantive rights that the statute creates. *See Meachum v. Fano*, 427 U.S. 215, 226 (1976) ("[A] person's liberty is equally protected, even when the liberty itself is a statutory creation of the State. The touchstone of due process is protection of the individual against arbitrary action of government[.]") (citation omitted).

## 5. The Recommendation Erred in Disregarding *In re Ward* and Plaintiff's *In Pari Materia* Argument.

This authoritative construction infringes due process for yet another reason. Alabama courts have failed to read § 15-18-200(e)(3) and (f)(2) *in pari materia* with Rule 32, in violation of established precedent by the Alabama Supreme Court. The Recommendation concluded that the key case on which Plaintiff relied, *Ex parte*

*Ward*, was not decided on due process grounds, and rejected Plaintiff's argument that these statues were in conflict with one another in any event.  *See* Doc. 65 at 30-31.  These conclusions are incorrect.

A criminal defendant in Alabama who seeks to vacate her conviction based on new DNA evidence would initiate a separate proceeding under Ala. R. Crim. P. Rule 32.  The showing that § 15-18-200 requires a convicted person to make to obtain testing and that Rule 32 requires her to make to obtain a vacatur of conviction must be construed in a manner that is "meaningful."  *See Ex parte Ward*, 89 So. 3d 720, 727 (Ala. 2011).

To warrant relief based on new DNA evidence, an Alabama state prisoner must meet the criteria set forth in Rule 32.1(e), which provides in pertinent part:

> (e) Newly discovered material facts exist which require that the conviction or sentence be vacated by the court, because:
>
> . . .
>
> (4) If the facts had been known at the time of trial or of sentencing, the result probably would have been different; and
>
> (5) The facts establish that the petitioner is innocent of the crime for which the petitioner was convicted or should not have received the sentence that the petitioner received.

Ala. R. Crim. P. 32.1(e).

In *Ward*, the defendant, who was convicted of murder and sentenced to life imprisonment, filed a petition under Rule 32.1(e), alleging that newly discovered forensic reports excluding him as the person who handled a cigarette butt that the State used at trial to connect him to the crime scene contradicted evidence material to the State's theory of the case and required his conviction to be vacated. *Ward*, 89 So. 3d at 721, 726, 728. The circuit court denied his petition. The Court of Criminal Appeals affirmed the denial, concluding that the cigarette-butt evidence did not establish that he was innocent under Rule 32.1(e)(5). *Id*. at 721, 727. The Alabama Supreme Court reversed, finding that imposing such a stringent standard violates principles of fundamental fairness:

> That reasoning would place an almost impossible burden on a criminal defendant to show that any single item of evidence would, by itself, establish his or her innocence. A common-sense reading of Rule 32.1(e) is one that requires a showing that the newly discovered facts go to the issue of the defendant's actual innocence (as opposed to a procedural violation not directly bearing on guilt or innocence). Otherwise, the requirement of Rule 32.1(e)(4)—a showing that "the result probably would have been different"—would add nothing to the formula for relief created by Rule 32.1(e); Rule 32.1(e)(4) would be rendered meaningless in the face of the greater requirement imputed to Rule 32.1(e)(5) that the newly discovered facts "establish" the defendant's innocence.[18]

---

[18]    "[T]his Court has noted that '[w]here the newly discovered evidence *tends to destroy or obliterate the effect* of the evidence upon which the verdict rested it is *more than impeaching* for . . . its tendency would be to defeat the verdict returned.'"  *Ward*, 89 So. 3d at 727 (emphasis in original) (citation omitted).

*Id.* at 727.  The court continued:

> Clearly, the newly discovered facts at issue here relate not
> to some procedural violation, but to Ward's actual guilt or
> innocence. As to the requirement in Rule 32.1(e)(4) that
> the result probably would have been different had the
> newly discovered evidence been presented to the jury, this
> calculation must be made based on the probative value of
> the newly discovered evidence and its relationship to the
> other evidence presented to the jury. *See Ex parte Frazier*,
> 562 So. 2d 560, 571 (Ala. 1989) ("[I]f the jury had been
> afforded the opportunity to consider this new information
> [about the true extent of a key prosecution witness's role
> in the crime] in conjunction with all of the other evidence
> introduced at trial, it would have reached a different
> result." (footnote omitted)).[19]

---

[19]    The Court concluded:

> The results of the forensic tests performed on the cigarette butt are
> of substantial probative value in relation to the other evidence
> bearing on the question of Ward's guilt or innocence. The evidence
> against Ward was largely circumstantial; the only physical evidence
> in the record tying Ward to the crime scene was the cigarette butt.
> Moreover, the State's theory of the case depended in material
> measure on its argument to the jury that the cigarette butt proved
> that Ward was present at the crime scene. If, as Ward has alleged,
> the newly discovered forensic test results contradict this theory, a
> material part of the State's evidence against Ward would be
> "destroy[ed] or obliterate[d]."
>
> In considering a claim that a criminal conviction should be vacated
> because of newly discovered material facts, a court must balance the
> principles of fundamental fairness against the finality of judgments.
> As then Judge Shaw noted in his concurring opinion in *Dowdell v.
> State,* 854 So. 2d 1195, 1198 (Ala. Crim. App. 2002):
>
> "A criminal trial is not a lottery, a spin of the roulette wheel or a
> throw of the dice. The orderly processing of cases through the court
> is an important value, but it is not the end in itself. It is only the
> method by which we attempt to achieve the ultimate purpose of the
> criminal justice system—the fair conviction of the guilty and the
> protection of the innocent. That is what our constitutional guarantees
> are all about. Our system fails every time an innocent person is
> convicted, no matter how meticulously the procedural requirements

*Id*. at 728.  The Alabama Supreme Court held that the defendant sufficiently pled his claim and that he was entitled to an opportunity to prove his allegations.  *Id.* at 729; *see also Cunningham*, 592 F.3d at 1263, 1270 ("[Rule 32] requires only that innocence be shown by a preponderance of the evidence to obtain a new trial" and newly discovered material facts must establish that the petitioner is innocent "to a sufficiently compelling degree that the 'result probably would have been different' if the evidence had been presented at trial") (citing Rule 32.1(e)(5) and (e)(4)). Contrary to the Recommendation, the Alabama Supreme Court's decision in *Ward* is evidence that, as currently construed by Alabama courts, litigants have a lesser burden to obtain a new trial under Rule 32 that to obtain DNA testing under the DNA statute.  *Cf*. Doc 65 at 31.

In construing the requirements of Rule 32.1(e), the court emphasized the presumption that "statutes are enacted with a 'meaningful purpose.'"  *Ward*, 89 So. 3d at 727 (citation omitted); *id.* at 727-28 ("[w]hen construing rules, this Court has applied the rules of construction applicable to statutes" and "rules and statutes relating to the same subject matter must be read *in pari materia*, thus allowing for legal harmony where possible") (citation omitted).

---

governing criminal trials are followed. . . . Consistent with society's 'overriding concern with the justice of the finding of guilt,' the courts, as well as the prosecution, must be vigilant to correct a mistake."

*Id*. at 728 (citations omitted).

Significantly, this principle has been applied in other jurisdictions in the exact circumstance at issue here.  New Hampshire's post-conviction DNA statute permits a court to order testing if, among other conditions, the petitioner has established by clear and convincing evidence that the results, assuming they are exculpatory, will constitute new, noncumulative material evidence that will exonerate the petitioner by establishing that he was misidentified as the perpetrator or accomplice to the crime.  N.H. Rev. Stat. Ann. § 651-D:2, III(e).  The standard in New Hampshire for seeking a new trial if favorable results are obtained from DNA testing is "that the evidence is of such a character that a different result will probably be reached upon another trial."  *State v. Breest*, 155 A.3d 541, 547, 549 (N.H. 2017) (citation omitted).  Noting the two distinct set of terms, the New Hampshire Supreme Court emphasized the importance of reading both standards "sensibly":

> [A]lthough we acknowledge the legislature's use of different terms in the sections of the statute dealing with prerequisites to testing and available remedies after testing has occurred, such difference cannot sensibly be construed to mean that when the legislature used the word "exonerate" in the former sections it intended that a defendant must make a greater showing just to obtain testing than he needs to make to obtain relief based on the "favorable" outcome of the testing.  *See* [N.H. Rev. Stat. Ann. §] 651-D:2, VI(b); *see also Breest*, 167 N.H. at 212-13, 108 A.3d 623 (a statute will not be construed in such a manner as to lead to an absurd result).

*Id.* at 548 n.4.  It would be similarly absurd to construe the Alabama DNA statute in a manner that would require a convicted person to make a greater showing just to

obtain testing than she must make to overturn her conviction under Rule 32 based on favorable results from that testing.  For *Ward's* purposes, it is of no moment that Alabama's DNA law is a separate statute from the Alabama Rules of Criminal Procedure.

> The correct rule of interpretation is, that if divers statutes relate to the same thing, they ought all to be taken into consideration in construing any one of them, and it is an established rule of law, that all acts *in pari materia* are to be taken together, as if they were one law. . . . In doubtful cases, a court should compare all the parts of a statute, and different statutes *in pari materia*, to ascertain the intention of the legislature.

*United States v. Freeman*, 44 U.S. 556, 564-65 (1845) (citation omitted).  "General rules of statutory construction provide that 'where two laws are in conflict, courts should adopt an interpretation that harmonizes the laws, for the Legislature is presumed to have intended that both laws are to operate coextensively and have the fullest possible effect.'"  *Dellavecchia v. GEICO Gen. Ins. Co.*, No. 8:09-CV-2175-T-27TGW, 2010 WL 11455215, at *2 (M.D. Fla. Dec. 16, 2010).  Therefore, and pursuant to the Alabama Supreme Court's decision in *Ward*, § 15-18-200(e)(3) and (f)(2) must be read *in pari materia* with Rule 32.

Alabama's post-conviction DNA statute, which sets forth requirements for access to scientific testing, cannot sensibly place a higher burden on a petitioner than a Rule 32 petition for post-conviction relief based on results obtained from that

testing.  Because the DNA statute is so construed by Alabama courts, the statute, as authoritatively construed, defies *Ward* and principles of fundamental fairness.

      **B.**      **The Recommendation Erred in Ratifying Alabama's Requirement That Applicants Demonstrate that the Evidence Sought to Be Tested Will Produce Accurate and Reliable Results**

            **1.**      **The Recommendation Erred in Concluding that Subsection (c) is Not Permissive, Even When Read in Conjunction with Subsection (f)(1).**

The Recommendation criticized Ms. Wilson for citing an earlier legal ruling in this case regarding interpretation: Wilson cited a previous recommendation from the magistrate judge, adopted by this Court, that described subsection 200(c) as "permissive, not binding, a fact which arguably may provide no guarantee of any due process at all. . . ." Doc. 65 at 33, fn. 15, *citing* Doc. 40 at 72; *see also* Doc. 27 at 29.  This is, in fact, the only reasonable interpretation of the statute. The very language of 15-18-200(c) states that a circuit court "may" order DNA testing.  While 15-18-200(f)(1) does state that the motion "shall" be ordered if the requirements of subsection (c) are met, it is followed by (f)(2)'s maxim that a court may deny testing, without qualification, if the court determines there is no reasonable possibility that the testing will produce exculpatory evidence that would exonerate the applicant. This Court's interpretation of the statute must give meaning to all the language of the statute. *Brotherhood of Locomotive Eng'rs & Trainmen Gen. Counsel Adj. CSX N. Lines v. CSX Transp.*, 522 F.3d 1190, 1195 (11th Cir. 2008) ("To the extent

possible, the rules of statutory construction require courts to give meaning to every word and clause in a statute.") (citing *United States v. Menasche*, 348 U.S. 528, 538-39 (1955); *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001)).   To reject this interpretation would improperly "render portions of [the] statute surplusage." *Id.* (citing *TRW*, 534 U.S. at 31.)  Section 15-18-200(c) remains permissive both because all subsections of 15-18-200(f)(1) must be met for testing to be ordered, *and* a court can still deny testing if it determines that testing will not exonerate the applicant. *See* 15-18-200(f)(2); *cf.* Doc. 65 at 33, fn. 15.

> **2.    The Recommendation's Interpretation of the "Accurate and Reliable Results" Requirement as Applying to Testing Methodology Is Contrary to the Record Evidence, Canons of Statutory Interpretation and Prior Decisions Interpreting this Subsection**

For a § 15-18-200 applicant to secure an order for post-conviction DNA testing, the court must find that the evidence sought to be tested "is in a condition that allows forensic DNA testing and analysis to be conducted which would yield accurate and reliable results."  Ala. Code § 15-18-200(c)(1); *see also id.* § 15-18-200(d) (if "reliable testing is not possible due to the condition or absence of the biological material," court shall dismiss the motion).

> Also, the provisions of 15-18-200(c) are permissive, not binding, a fact which arguably may provide no guarantee of any due process at all for one who qualifies to file a motion under Alabama's DNA law to vindicate the limited liberty interest identified in *Osborne*.

Doc. 27 at 29.

The evidence in Ms. Wilson's case, as in the large majority of criminal cases in this State, is, and has been, in the complete and continuous custody and control of the State. This provision requires Ms. Wilson to examine—in fact, *test*—the evidence without affording her access to that very evidence.

Pursuant to this Court's February, 2019, Scheduling Order (Doc. 33 at 2), Ms. Wilson produced to Defendants an expert report from Deanna Lankford, the Director of Forensic Casework at Bode Technology ("Bode"), an internationally-accredited leading private laboratory and research facility that specializes in forensic DNA testing and conducts DNA testing for federal and state law enforcement agencies, private individuals and non-profit organizations nationwide. *See* Doc. 40, Ex. 19, Expert Report of Deanna Lankford (June 19, 2019) (hereinafter "Lankford Aff.) ¶ 1. Ms. Lankford has over 20 years of experience in DNA analysis and interpretation, has performed DNA testing, analysis, and technical review in thousands of forensic cases both pre-trial and post-conviction, and has been accepted by courts in cases across the nation as an expert in DNA testing. (Lankford Aff. ¶ 3.) Ms. Lankford's laboratory, Bode, has extensive experience developing genetic profiles from severely degraded and decades-old evidentiary samples. (Lankford Aff. ¶¶ 8, 16.)

Ms. Lankford's sworn report states that DNA profiles can be developed from minute quantities of evidence, including skin cells invisible to the naked eye, that

earlier techniques were not designed to detect.  (Lankford Aff. ¶¶ 13-14.)  Ms. Lankford asserts that Bode has successfully obtained profiles that produced accurate and reliable results from forensic evidence in thousands of cases, including post-conviction criminal cases, on evidence very similar to the types of items collected in Ms. Wilson's case.  (Lankford Aff. ¶¶ 5, 8, 16, 23, 25.)  She states that advanced DNA testing on decades-old evidence, including evidence collected over thirty years ago, is capable of producing interpretable profiles that would yield accurate and reliable results and that evidence collected from crime scenes over thirty years ago has, in fact, routinely been subjected to modern DNA testing which is capable of producing accurate and reliable results.  (Lankford Aff. ¶¶ 6-9, 27.)

Ms. Lankford identified types of evidence that are suitable for modern DNA testing, the techniques used to recover biological material from the evidence, and the technologies that can be applied to produce interpretable DNA profiles from that biological material.  (Lankford Aff. ¶¶ 14-26.)  She stated, however, that in the thousands of DNA cases she has worked on, she "did not – and could not – know" whether testing of the physical evidence would produce accurate and reliable results until that testing was performed and that it is "impossible" to determine whether evidence is in a condition that allows DNA testing to be conducted which would produce accurate and reliable results "before actually conducting the testing." (Lankford Aff. ¶ 27.)

> As a forensic DNA analyst, supervisor, and lab director, I
> have worked on numerous cases that were decades old
> where I or my colleagues thought it unlikely that a DNA
> profile would be obtained from the evidence due to the
> age, appearance, and/or storage conditions, but
> nevertheless we obtained accurate and reliable DNA
> results.  Similarly, I have worked on many cases where I
> or my colleagues thought there was a high probability that
> we would obtain DNA results from the evidence, but the
> DNA was so degraded that we were unable to get any
> results.  It is impossible to know whether DNA testing of
> evidence will yield accurate and reliable results without
> first testing that evidence.  The only way to determine
> whether evidence is in a condition that allows DNA testing
> to be performed that would produce accurate and reliable
> results is to actually perform the testing.

(Lankford Aff. ¶ 11.)

Defendants submitted an affidavit from the Director of the Alabama Department of Forensic Sciences ("DFS"), Angelo Della Manna.  Affidavit of Angelo Della Manna (July 15, 2019) (hereinafter "Della Manna Aff."), Doc. 40, Ex. 20.  Mr. Della Manna did not dispute the conclusions in Ms. Lankford's expert report.  In fact, Mr. Della Manna described the modern DNA technologies available at DFS, his experience using those latest technologies, DFS's ability to upload eligible profiles to the FBI databanks, and went so far as to offer that any DNA testing in this case occur at DFS.  (Della Manna Aff. at 2, 8-9.)  Indeed, contrary to the Recommendation's conclusions, *see* Doc. 65 at 34-35, fn. 17, Mr. Della Manna did identify several items of physical evidence in Ms. Wilson's case that have been

located and suggested that the items *are* suitable for DNA testing.  (Della Manna Aff. at 3-10.)

The fact that a qualified expert in DNA analysis—who has decades of experience in DNA testing and interpretation—cannot meet the requirement in subsection (c)(1) proves that this requirement presents an impossible hurdle for an applicant to surmount.  Nor could the hundreds of men and women in this nation proven innocent by post-conviction DNA testing have been able to meet such an impossible condition.  Indeed, prosecutors have picked up on this impossible ground in opposing motions for testing under the statute.  *See, e.g., Roberts v. State*, CC 1990-629, Doc. 41-Ex. 16 at 4 (Jefferson County, filed Nov. 2010) (stating that petitioner "is unable to assert that he has met th[e] requirement of § 15-18-200[(c)(1)]" because he has not "viewed, or had a DNA expert assess the condition of the items requested"); *Jerome Smith v. State*, CC 1985-1261.60, Doc. 41-Ex. 17 at 3 (Jefferson County, filed Oct. 2010) (exact same language).

Because § 15-18-200(c)(1) requires Ms. Wilson and all other DNA applicants to do the impossible, it "transgresses a[ ] recognized principle of fundamental fairness in operation."  *Osborne*, 557 U.S. at 69 (quoting *Medina v. Cal.*, 505 U.S. 437, 446, 448 (1992)).  No set of circumstances exists under which this provision would be valid.  *Salerno*, 481 U.S. at 745.

## CONCLUSION

For the aforementioned reasons, Ms. Wilsons' objections to the Recommendation should be sustained, her motion for summary judgment granted, and Defendants' motion for summary judgment denied.

Respectfully submitted,

*/s/* Vanessa Potkin
*Counsel for Plaintiff Betty Wilson*
Admitted *pro hac vice*
NY Bar No. 3966413
INNOCENCE PROJECT
40 Worth Street, Suite 701
New York, NY  10013
Tel.: (212) 364-5982
Fax: (212) 364-5341
vpotkin@innocenceproject.org

Jane Pucher (*pro hac vice pending*)
NY Bar No. 4996898
INNOCENCE PROJECT
40 Worth Street, Suite 701
New York, NY  10013
Tel.: (212) 364-5982
Fax: (212) 364-5341
jpucher@innocenceproject.org

Tara Thompson (*pro hac vice pending*)
Illinois Bar No. 6279922
INNOCENCE PROJECT
40 Worth Street, Suite 701
New York, NY  10013
Tel.: (212) 364-5982
Fax: (212) 364-5341
tthompson@innocenceproject.org

Kevin R. Garrison
Alabama Bar No. ASB-5504-N54G
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.
420 20th Street North
Shipt Tower, Suite 1400
Birmingham, Alabama  35203
Tel. (205) 250-8333
Fax: (205) 488-3733
kgarrison@bakerdonelson.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing was filed via the Court's CM/ECF system, which

forwards a copy of the foregoing to counsel of record identified below.


J. Clayton Crenshaw
Office of the Attorney General
501 Washington Ave.
Montgomery, AL 36130
Tel.: (334) 242-7423
Fax: (334) 353-3637
ccrenshaw@ago.state.al.us

s/Kevin Garrison
*Counsel for Plaintiff*